1825.
De Wolf
v.
Johnson.

Judgment affirmed, with costs.

---

[USURY. LEX LOCI CONTRACTUS.]

# DE WOLF v. J. JOHNSON, R. M. JOHNSON, W. T. BARRY, and J. PRENTISS.

In a contract for the loan of money, the law of the place where the contract is made is to govern; and it is immaterial that the loan was to be secured by a mortgage on lands in another State.

In such a case, the statutes of usury of the State where the contract was made, and not those of the State where it is secured by mortgage, are to govern it, unless there be some other circumstance to show, that the parties had in view the laws of the latter State.

Although a contract be usurious in its inception, a subsequent agreement to free it from the taint of usury, will render it valid.

The purchaser of an equity of redemption cannot set up usury as a defence to a bill brought by the mortgagee for a foreclosure, especially if the mortgagor has himself waived the defence.

Under a usury law which does not avoid the securities, but only forbids the taking a greater interest than six per centum per annum, a Court of equity will not refuse its aid to recover the principal.

A certificated bankrupt or insolvent, against whom no relief can be had, is not a necessary party to a suit in equity; but if he be made a defendant, he cannot be examined as a witness in the cause, until an order has been obtained upon motion for that purpose.

1825.

De Wolf
v.
Johnson.

APPEAL from the Circuit Court of Kentucky. This was a bill filed by the appellant, De Wolf, in the Court below, on the 4th of September, 1818, for a foreclosure of a mortgage given by Prentiss, one of the respondents, on the 7th of July, 1817, to secure the repayment of the sum of 62,000 dollars. The bill alleged, that the mortgagor had conveyed his equity of redemption to W. T. Barry, by a deed of trust dated the 16th of March, 1818, describing the lands as " all those tracts or parcels of land described and contained in a deed of mortgage from the said J. Prentiss to the said J. De Wolf, dated the 7th of July, 1817," " it being the intention and meaning hereof, that after the satisfaction of the debts set forth in said deeds, the remainder of the property described in said deeds," " shall be hereby conveyed." According to the provisions of the deed, Barry exposed the premises for sale at public auction, on the 27th of May, 1818, " subject to the encumbrances of any previous mortgage or deed of trust, particularly a mortgage deed to J. De Wolf, from J. Prentiss, dated the 7th of July, 1817," " recorded in the clerk's office of the Fayette County Court, and to which all persons wishing to purchase are referred for more particular information." At this sale, the property was purchased by J. Johnson and R. M. Johnson. Prentiss filed no answer to the bill, and it was taken *pro confesso* against him. J. Johnson answered, claiming as a *bonâ fidei* purchaser for a valuable consideration, and setting up the defence of

usury in the contract between Prentiss and the appellant, De Wolf, and also denying notice of the mortgage except by vague report, which report was accompanied with the suggestion, that the mortgage was void, as being affected with usury. Barry also answered, admitting the conveyance to himself by Prentiss, in trust to sell, which sale he had effected publicly, and in good faith, before the bill filed; and in pursuance of the sale had conveyed to the defendants, J. and R. M. Johnson; and alleged, that he was ignorant of the claim of the plaintiff, De Wolf, except so far as that claim was recognised in the deed of trust; and also set up the defence of usury between the mortgagor and mortgagee. The other defendant, R. M. Johnson, answered, recognising and adopting the answer of J. Johnson, and denying for himself all knowledge of the mortgage at the date of the conveyance to Barry. He also averred, that he was a creditor of Prentiss to the amount of nearly 500,000 dollars, for which he had no other security than the assignment to Barry, through which he derived title to the mortgaged premises. The cause went to hearing on the pleadings and proofs, and Prentiss was admitted as a witness on the part of the other defendants, subject to legal exceptions; but it did not appear by the transcript of the record, whether the decree of the Court below was grounded upon his testimony. It appeared by the other evidence in the cause, that the transaction originated in a loan made by De Wolf to Prentiss, in the State of Rhode Island

4

in the year 1815, the repayment of which was secured by a mortgage upon the lands in Kentucky, which contract was afterwards waived by the parties, and a new contract entered into by them in the State of Kentucky, in the year 1817. The principal question of fact was, whether either, or both of those contracts, was void, under the usury laws of either of those States, and as this question is fully considered in the opinion of this Court, it has not been thought necessary to extract from the voluminous mass of testimony in the Court below, the general result of the evidence as bearing upon it.

On the part of the appellants, it was contended:

1. That the original contract of 1815, if usurious, was not void according to the laws by which it ought to be governed; the laws of Rhode Island not avoiding the contract, or the securities given for it, but only forfeiting one third of the principal, and all the interest of the loan, as a penalty to be recovered by information or action of debt.

2. That the contract of 1817 was free from the taint of usury.

3. That if either, or both those contracts, were usurious, the defendants, J. & R. M. Johnson, could not take advantage of the usury, not only because they were not parties to the contract, but because, by the very terms of the deed of trust to Barry, under which they claim, they

took the estate in controversy subject to the prior conveyance to the appellant.

On the part of the respondents, it was insisted :

1. That the loan of 1815 was usurious and void.

2. That the transaction of 1817 was a device to secure the repayment of money advanced on an usurious agreement.

3. That money advanced on an usurious agreement cannot be secured, and the payment enforced in a Court of equity, at the instance of the lender, by force of any after agreement of the lender to relinquish the usury, and of the borrower to repay the money lent.[a]

*a* The act of Rhode Island of 1798, after prohibiting (s. 1.) the contracting for more than six per centum per annum for the loan of money, wares, goods, &c. provides, (s. 5.) " that a sum equal to one third part of the principal, and all the interest of every bond, mortgage, specialty, agreement, contract, promise, or assurance whatsoever, which shall be made after the passing of this act, for the payment of money, goods, wares, or other commodities to be lent on usury, wherein or whereby there shall be received, agreed for, or taken, for the forbearance or giving day of payment above the rate of interest expressed in the first section of this act, shall be forfeited by the creditor, one half of such forfeiture for the use of the State, and the other half for the use of him, her, or them, who will prosecute for the same. That the said forfeiture shall and may be recovered by information or action of debt, before any Court proper to try the same; that in the trial of every such information or action, the borrower or hirer of the money, goods, wares, or other commodities, on such usurious contract, shall be admitted a legal witness, if not interested in the event of such prosecution ; provided, nevertheless, that all informations and actions for the recovery of such forfeiture, shall be brought and commenced

1825.

De Wolf
v.
Johnson.

*March* 14*th*.

Mr. *Jones* and Mr. *P. Hall,* for the appellant, argued, that contracts being to be governed by the laws of the country where they are made, as to their nature, construction, and effect, the original contract of 1815 was not within the statute of Kentucky as to usury.[a] The rate of interest is governed by the law of the country where the debt was contracted, and not according to that where the action is brought.[b] That if there be no express reference to any other place, the law will intend that the contract was to be executed where it was made, and have a reference to the law of that State. Nor would taking a security upon lands in another country, vary the application of the rule. Thus, contracts made in England, secured by mortgage on estates in the West-Indies, are construed by the English law.[c] So, where the debt was contracted

within one year after such forfeiture shall have accrued. Provided further, that nothing in this act shall extend to the letting of cattle, or other usages of the like nature in practice amongst farmers, or maritime contracts amongst merchants, as bottomry, insurance, or course of exchange, as hath been heretofore accustomed."

The act of Kentucky of 1798 prohibits the taking above the rate of six per centum per annum as the interest for the loan of money, wares, or merchandise, and declares, that "all bonds, contracts, covenants, conveyances, or assurances, hereafter to be made for any money or goods so to be lent, on which a higher interest is reserved or taken than is hereby allowed, shall be utterly void."

a *Ord on Usury,* 32. (d.) Blanchard v. Russell, 13 *Mass. Rep.* 4. Hicks v. Brown, 12 *Johns. Rep.* 142, 5 *Day's Rep.* 322. 2 *Washington's Rep.* 282. Van Reimsdyke v. Kane, 1 *Gallis. Rep.* 371. 4 *Day's Rep.* 96.

b 2 *Johns. Ch. Cas.* 365.

c De War v. Span, 3 *Term Rep.* 425

in Ireland, and the security given in England, it was held, that Irish interest should be allowed.[a] If the contract be not void by the laws of the country where it was made, it can never become so by being carried into another country to be enforced; if valid in the country where it was made, it will be valid everywhere, unless some reason of policy oppose its execution.[b] Usury is only *malum prohibitum,* and independent of statutory regulation, the parties may contract for whatever rate of interest they please.[c] Unless the statute of usury which applies to the case, avoids the contract, the defendant cannot avail himself of this ground of defence. Penal laws are strictly local, and the statute of Rhode Island is merely a penal law.[d] The respondents, seeking to avail themselves of usury in a contract made in that State, must show that it would be a good defence there.[e] If the contract of 1815 were good under the law by which it ought to be governed, it would not be invalidated by the subsequent contract, even if that were void.[f] But the contract of 1817 was, in fact, free from usury; and would have the effect of purifying the previous con-

1825.

De Wolf
v.
Johnson.

---

*a* Champant v. Lord Ranelagh, 1 *Equ. Cas. Abr.* 289.

*b* 3 *D. & E. Rep.* 370. note. *Cowp. Rep.* 341.

*c* 8 *Wheat. Rep.* 355.

*d* Scoville v. Canfield, 14 *Johns. Rep.* 339. 4 *Burr. Rep.* 2251. 2 *Mod. Rep.* 307. *Ord on Usury,* 194.

*e* Thompson v. Ketchum, 8 *Johns. Rep.* 189. 3 *Esp. N. P.* 163.

*f* Swartwout v. Payne, 19 *Johns. Rep.* 294.

1825.

De Wolf
v.
Johnson.

tract from all taint.[a]  Where usurious securities have been destroyed by mutual consent, a promise by the borrower to repay the principal and legal interest is binding.[b]  As to the sale of stock, if it was fair and *bona fide*, and not with a view to evade the statute, it would not invalidate the contract.  As to the amount advanced in treasury notes, they are to be put on a footing with bank notes, and if received in payment, are to be considered as cash.[d]  A tender in bank notes, if not objected to, is good.  The sum paid as rent is not usurious, unless paid in consequence of a previous corrupt agreement.[f]  A payment in the nature of a penalty is not usurious.[g]  If there be any usury at all in the new contract of 1817, it has crept in by mistake and miscalculation, and that will not avoid it.[h]  The testimony of Prentiss to prove the alleged usury is inadmissible, because he is a party upon the record, is liable for costs, is directly interested in the event of the

a  *Comyn on Usury,* 183—185.

b  *Ord on Usury,* 103.  3 *Day's Rep.* 350.  10 *Mass. Rep.* 121.  Barnes v. Headly, 2 *Taunt. Rep.* 184.  Chadburn v. Watts, 10 *Mass. Rep.* 123.

c  3 *Term Rep.* 531.  8 *East's Rep.* 307.  *Ord on Usury.* 76.  2 *Dall. Rep* 92.  *Comyn on Usury,* 110.  1 *Esp. N. P.* 40. 176

d  3 *Burr. Rep.* 1516.  1 *Burr. Rep.* 452.  9 *Johns. Rep.* 120

e  3 *Term Rep.* 554.  7 *Johns. Rep.* 476.  19 *Johns. Rep.* 508.  10 *Mass. Rep.* 284.

f  *Comyn on Usury,* 187.  7 *Mod. Rep.* 118.  8 *Mass. Rep.* 101. 258.  10 *Mass. Rep.* 121.  4 *Burr.* 2253.

g  *Comyn on Usury,* 72.

h  *Ord on Usury,* 37.  1 *Camp. N. P.* 149.  3 *Wils.* 390.  4 *Burr.* 2253.  9 *Mass. Rep.* 49.  1 *Bos. & Pull.* 149.

suit, and is concluded by the decree.[a] And final-
ly, even if usury exist, and be ever so clearly
proved, the defendants, J. & R. M. Johnson, can-
not take advantage of it, since they purchased,
subject to De Wolf's mortgage, which, if usuri-
ous, is not to be taken as absolutely void.[b]

Mr. *Webster* and Mr. *Bibb*, contra, admitted
the general rule as to the *lex loci contractus*, but
contended, that the present contract was made
with a view to the laws of Kentucky, where the
borrower was domiciled, where the security was
given, and where the money was to be repaid. It
was an exception to the rule, that where the
contract was made in one country with a view
to the laws of another, the statutes of the latter
were to govern it.[c] This was founded upon the
same reason with the rule itself, i. e. the inten-
tion of the parties. Another exception is, where
the parties go from one country into another,
nad there make a contract with a view to evade
the laws of the former. So if it be against the
public policy of the country where performance
of the contract is sought, to enforce it, the rule

*a* Phill. Evid. 57. 61, 62. 5 Johns. Ch. Cas. 95. 14 East's
Rep. 565. 10 Johns. Rep. 95. 2 Wheat. Rep. 193. note. 20
Johns. Rep. 142. 5 Esp. N. P. 155. 6 Wheat. Rep. 109.

*b* Green v. Kemp, 13 Mass. Rep. 515. 16 Mass. Rep 96. 5
Johns. Ch. Rep. 122. 555. 10 Johns. Rep. 202. 15 Johns.
Rep. 555. 1 Taunt. 414. 9 Mass. Rep. 48 Buc. Abr. tit.
Usury F. Bull. N. P. 224. 1 Johns. Ch. Rep. 158.

*c* Huber. Prælect. tom. 2. 1. 1. tit. 3. Robinson v. Bland, 2
Burr. 1077.

does not apply.[a]  But, it was insisted, that by the law of Rhode-Island, where the original agreement was made, it was absolutely void; and, as such, could not be enforced in any other State or country.   But the statute of Kentucky, which was the law properly applicable to the case, not only prohibited the usurious contract, but absolutely avoided the securities.   It was well settled, that any device, however specious, by which illegal interest is reserved, would render the contract void.[b]   Even a beneficial purchase by the lender, or disadvantageous purchase by the borrower, will be considered within the statutes of usury, if connected with a loan, or treaty, or communication for a loan.[c]   So a sale of goods, or stock, as a contrivance to evade the usury laws, avoids the contract.[d]   And if the lender, in part of his advance, give a bill or note, payable at a future day, and charges interest from the date of the contract, it is usurious.[e]   A contract, void upon the ground of usury, cannot be made good by a subsequent new agreement,

a 3 Dall. 374. note.  Hargr. Co. Litt. 79 b. 44. note.  3 Atk. 727.  1 Vern. 428.

b Cowp. 114.  3 Bos. & Pull. 154.  Cro. Eliz, 27.

c 1 Sch. & Lef. 115. 182. 119. note   Chitty on Bills. 94, 95. Bac. Abr. Usury, (C.) 2.  1 Johns. Cas. 536.  Cowp. 796. 770. Cro. Jac. 440.

d 2 Dougl. 735.  Cowp. 793.  1 Atk. 351. Bac. Abr. Usury, (C.) 8, 9. 13  2 Vez. 155.  7 Johns. Rep. 196.  3 Term Rep. 531.  1 Bro. Ch. Rep. 149. 151.  Esp. N. P. 11.  Ambl. 371. 1 Johns. Ch. Rep. 537.

e 13 Johns. Rep. 40.  2 Johns. Ch. Rep. 192.  4 Taunt. 810 1 Bos. & Pull. 144.

and if void in part, it is void *in toto*.[a] If the lender of money, on an usurious contract, seeks to enforce his securities in a Court of equity, the securities will be declared void, and ordered to be delivered up; and in this respect, the rule is different, where the borrower himself applies to the Court for relief, in which latter case he must pay, or offer to pay, the principal and interest lawfully due, before he is entitled to relief.[b] But it is sufficient if a contract be prohibited by positive law, for a Court of equity to refuse its aid in enforcing it, whether the securities given be expressly declared void or not. The other defendants, claiming to stand in the place of Prentiss, as his assignees and creditors, have a clear legal and equitable right to take advantage of the illegality of the contract made with him, and which was attempted to be secured by a mortgage upon his property.

Mr. Justice JOHNSON delivered the opinion of the Court.

This cause has been discussed very much at large, and with a degree of talent, candour, and research, very satisfactory to the Court. In proceeding to consider it, however, we think it advisable to deviate from the order in which the points were examined at the bar, and to pursue them as they arise in the progress of the suit.

In the year 1818, the complainant filed his bill in

*a* 4 *Camp. N. P.* 157.   8 *Johns. Rep.* 253.
*b* 5 *Johns. Ch. Rep.* 122.

the Circuit Court of the United States for Kentucky, to obtain a foreclosure of a mortgage given to secure the sum of sixty-two thousand dollars, and bearing date July 7, 1817. The debt secured was payable by instalments, only one of which was due when the bill was filed, but in the progress of the cause all the instalments falling due, they were all, by consent, admitted into the pleadings, as if introduced by supplemental bill.

The bill first sets out the mortgage and the breach, and then proceeds to allege, that Prentiss, the mortgagor, had conveyed his equity of redemption to W. J. Barry, who had sold to James Johnson and R. M. Johnson, the two latter of whom were then in possession.

Prentiss files no answer, and in due course the bill, as to him, is ordered to be taken *pro confesso*. James Johnson files an answer, claiming as *bona fide* purchaser for a valuable consideration, and setting up the defence of usury in the contract between Prentiss and the complainant, and putting the complainant generally upon his proof. He also denies notice of De Wolf's mortgage, otherwise than by vague report, which report, he alleges, was accompanied with the suggestion, that the mortgage to De Wolf was affected with usury, and void.

At a subsequent day, Barry also answers, admitting the conveyance to himself by Prentiss, in trust to sell, which sale, he alleges, he had effected publicly, and in good faith, before the bill was filed; and in pursuance of such sale, had con-

veyed to the Johnsons. He further alleges, that at the time of the execution of the deed of trust to him, " he was ignorant of the complainant's claim, except so far as, that claim is recognised in the deed of trust," and also sets up the usury between the mortgagor and mortgagee, in avoidance of the mortgage.

R. M. Johnson also files an answer, in which he recognises and adopts the answer of James Johnson, and further denies, altogether, knowledge of the mortgage to De Wolf at the date of the transfer to Barry. He then sets out, that he is a creditor of Prentiss to the amount of near 500,000 dollars, for which he has no other security than the assignment to Barry, through which he derives title to the mortgaged premises.

Upon this state of the pleadings, with a few formal and immaterial additions, the parties went into their proofs. And as the complainant exhibited his mortgage in legal form, and with all the evidence of authenticity required by law, it followed that the defendants were put upon their proof to maintain the grounds on which they sought to avoid it.

It was not contended, that in the immediate contract on which the bill was founded, there was any usurious taint belonging to that transaction itself. The ground taken was usury in a transaction anterior by two years, out of which the mortgage in question drew its origin, and from which the usurious taint was supposed to be transmitted either directly or incidentally. The case proposed to be established in proof

was, that in the year 1815 there was a negotiation for a loan between these parties, the scene of which was in Bristol, Rhode Island. That the sum to be loaned was 83,000 dollars, but which sum in fact was reduced below 80,000 dollars, by means which they contended were resorted to for the purpose of disguising the usurious interest, to be retained by way of premium, or bonus, or imposition. That the interest actually stipulated for was twelve per cent., of which six per cent. was reserved in a bond executed at the time for 111,000 dollars, comprising compound interest, there being no annual interest reserved. The other six per cent. was secured under the aspect of a rent payable out of lands in Kentucky, for which Prentiss executed absolute conveyances, and De Wolf stipulated to reconvey on the payment of the amount for which Prentiss gave his bond, and a sum annually, by way of rent, equal to six per cent. upon the 83,000 dollars, that is, the sum of 4,980 dollars.

This rent, it seems, was paid the first year, together with an additional sum of 498 dollars, added as interest and damages.

And a bill for the sum of 4,980 dollars was drawn the second year by De Wolf upon Prentiss payable in Philadelphia, but this was returned under protest, and subsequently taken up by a bill for 5,154 dollars, endorsed by J. T. Meder, jun. The evasion of the statute against usury, supposed to have been practised upon Prentiss in making up the sum of 83,000 dollars, had relation to three items. The first a sum of about

32,000 dollars, admitted into the computation as
the price set upon fifteen shares of the Lexington
Manufacturing Establishment, transferred by De
Wolf to Prentiss. The second, treasury notes
to the amount of 20,211 dollars 94 cents, re-
ceived at par; and the third 30,802 dollars 73
cents, bills drawn upon Philadelphia also taken
at par. Upon these three items there was an
estimated loss sustained of about 3,400 dollars.

The contract of 1815 was unquestionably en-
tered into in the State of Rhode Island, and was
there reduced to writing; but had a view to Ken-
tucky for its consummation. As it entered into
the contract that Prentiss should secure De Wolf
by a conveyance of Kentucky land to a large
amount, two agents were employed and intrusted
by De Wolf, with the securities to be passed to
Prentiss, and a power to draw upon him for the
money, to be paid in Philadelphia; which Pren-
tiss was to have the benefit of, upon complying
with the articles of his contract, purporting an
absolute conveyance of the land. The place
where the contract of repayment of the principal
on the part of Prentiss was to be fulfilled, appears
no farther than this, that the bond is given to
pay generally, without regard to place; and the
money to be paid by way of rent, appears by the
subsequent acts of the parties respecting the
bills drawn for the rent, to have been payable in
Philadelphia.

The contract of 1817, in which this mortgage
originated, was executed in Kentucky; and had
its inception in an intimation from Prentiss of a

design to avail himself of the plea of usury. Upon this, De Wolf repaired to Kentucky, and there instituted a new negotiation with Prentiss personally, having for its object to clear the contract from all usurious incidents, and to take security for the sum loaned, at the legal interest of Kentucky, which, as well as that of Rhode-Island, is six per cent. Accordingly, all the instruments of writing which appertained to the old contract were surrendered mutually, and a new mortgage given to secure the balance now sued for; the original sum having been reduced by large actual payments to the sum for which this mortgage was given, and which includes the same premises conveyed under the prior contract.

The defence set up rests upon the assumption that the new contract was not purged of the usury; or, rather, that the whole contract of 1815 was void, and could, therefore, form no basis or consideration for the contract of 1817. Or if not wholly void, it comprised several items of an usurious character, which ought to be included in the new contract. And here two preliminary questions arose, the first of which was, whether the *lex loci* of the contract of 1815 was Rhode-Island or Kentucky? By the usury laws of the latter, the contract, and all the securities given for it, are void, both for principal and interest. By the laws of the former, although it is prohibited to take more than six per cent. interest, and a penalty imposed for the offence, the act does not render the contract void, certainly not for the principal sum. By the laws of Ken-

tucky, it is supposed, that the principal debt being abolished, there could be no consideration to sustain the new contract; by the laws of Rhode-Island, that the reverse would be the effect, unless, as was contended in argument, that the simple prohibition of such a contract, which is express in the Rhode-Island act, would affect it with the character of an illegal contract, and, as such, one which a Court of equity would not lend its aid to carry into effect.

With regard to the locality of the contract of 1815, we have no doubt, that it must be governed by the law of Rhode-Island. The proof is positive that it was entered into there, and there is nothing that can raise a question but the circumstance of its making a part of the contract, that it should be secured by conveyances of Kentucky land. But the point is established, that the mere taking of foreign security does not alter the locality of the contract with regard to the legal interest. Taking foreign security does not necessarily draw after it the consequence that the contract is to be fulfilled where the security is taken. The legal fulfilment of a contract of loan, on the part of the borrower, is repayment of the money, and the security given is but the means of securing what he has contracted for, which, in the eye of the law, is to pay where he borrows, unless another place of payment be expressly designated by the contract. No tender would have been effectual to discharge the mortgagee, unless made in Rhode-Island. On a bill to redeem, a Court

*The law of the place where the contract was made is to govern, and it is immaterial that the loan was to be secured by a mortgage on lands in another State.*

**1825.**

De Wolf
v.
Johnson.

*How far the evidence of Prentiss, one of the parties to the suit; was admissible.*

calling the mortgagee to Kentucky in order to receive a tender.

In the effort to sustain his defence under the laws of Rhode-Island, the defendants have introduced into the cause the examination of their co defendant, Prentiss, taken at the instance of themselves, and received in the Court below subject to legal exceptions. We are not informed whether the Court below actually recognised it as competent evidence, since the grounds on which that Court dismissed the bill are not spread upon the record. It is enough that it does not appear to be rejected; we are now called upon to pass an opinion upon it.

*A certificated bankrupt or insolvent, against whom no relief can be had, is not a necessary party; but he cannot be examined as a witness in the cause, until an order has been obtained upon motion for that purpose.*

The only grounds upon which an argument has been made in support of the admissibility of Prentiss' deposition, have been, that the complainant avers him to be insolvent, which fact the testimony in the cause goes also far to establish; and that his deposition was taken before he was in reality made a party by the service of a subpœna. But, on no principle can his evidence be adjudged competent. It is true, that cases occur in which certificated bankrupts are struck out of a record and made witnesses; but if this was a case in which a motion to strike out could have been sustained, the motion should have been made, and the party's name expunged from the record. On no principle could he be made a witness while he was himself a party. He may have had little or no interest in the event of the suit, except as to the costs; but still, while a party to the record, he could not be examined. We

know of no exception to this rule, whatever be
the Court in which the question occurs, except it
be in the administration of certain branches of
the admiralty jurisdiction.  From the views that
we take of the case, however, we do not find it
necessary to inquire whether there is sufficient
evidence in the cause, after rejecting the evidence
of Prentiss, to sustain the facts on which the de-
fence rests.  If, with the aid of that testimony,
the defence cannot be sustained; *a fortiori,* it
cannot be without it.  And here it may be pro-
per to premise, as was very correctly remarked
in the argument, that there has not been, in fact,
any contrariety of opinion expressed by the coun-
sel on the law of usury.  Usury is a mortal taint
wherever it exists, and no subterfuge shall be
permitted to conceal it from the eye of the law;
this is the substance of all the cases, and they
only vary as they follow the detours through
which they have had to pursue the money lender.
But one difficulty presents itself here of no ordi-
nary kind.  It is not very easy to discover how
the taint of Rhode-Island usury can infuse itself
into the veins of a Kentucky contract.  The de-
fence would not admit of a moment's reflection if
it rested on the direct effects which laws against
usury have upon contracts.  Whatever sums may
have been derived through the usurious contract
of 1815, to the contract of 1817, they would not
affect the latter with usury, unless introduced in
violation or evasion of the laws of Kentucky, for
the two contracts are governed by laws that have
no connexion.  But it makes very little differ-

1825.

De Wolf
v.
Johnson.

ence in this case, since, if the contract of 1817 is, either in whole or in part, unconscionable, this Court would not lend its aid to execute it as far as it was unconscionable, and the argument goes to show that it partakes of that character, because, admitting that the law of Rhode-Island did not render the contract of 1815 null and void for the principal sum loaned, yet the sum exhibited in that contract, as principal, and so transmitted to the latter contract, contained sundry items, which it is contended, were passed upon Prentiss at a great loss, and under circumstances calculated to serve as a disguise to usury.

And first, as to the shares in the Lexington Manufacturing Company; these were fifteen in number, and appear to have been taken by Prentiss on account of the 83,000 dollars, about 2,000 dollars a share. The whole of which, there is reason to think, was sunk in his hands, in the general wreck of the adventure.

It cannot be denied, that this is a suspicious item; it does not, in general, comport with a negotiation for a loan of money, that any thing should enter into the views of the parties but money, or those substitutes which, from their approximation to money, circulate with corresponding, if not equal facility. Still, however, like every other case, it is open to explanation, and the question always is, whether it was or was not a subterfuge to evade the laws against usury. And, here it is to be observed, that it is not every sale which, in a negotiation for a loan, will taint the transaction with usury; for it may

comport perfectly with the general views of the
borrower to make such a purchase, or to take
the article even in preference to money. I would
illustrate this by the case of a merchant who pro-
poses to borrow a capital to adventure in trade,
and who, instead of money, receives an assort-
ment, at a fair price, adapted to that trade. There
would be no ground for attributing to such a
transaction a design to evade the statute. But
in what does the present case vary from that?
Prentiss had embarked in a manufactory, of the
prospects of which he entertained the highest
hopes. He either believed, or endeavoured to
persuade others, that it would yield fifty per cent.
The De Wolfs had embarked, on his represen-
tations, 30,000 dollars in the enterprise. No ex-
periments had been yet made from which any
doubts could be excited, nor is there any proof
that the stock was falling. Under these circum-
stances, he proposes to take back the shares if
he could procure money to complete the esta-
blishment. The connexion between the actual
loan, and taking the shares as part of the loan,
was easy and natural, and the interest of twelve
per cent., with other incidental advantages held
out for the loan, may well be estimated as the ac-
tual inducement, without supposing that De Wolf
was conscious of passing this item upon Prentiss
at an inflated price. Prentiss had himself put a
value upon these shares but a short time before,
in the sale to De Wolf, at nearly the same price,
and De Wolf was either his dupe, or the shares
were resold at their value. Prentiss's continuing

confidence in their value is positively deduced from the efforts he made to complete, at every hazard and sacrifice, the establishment to which those shares appertained. He still thought it a profitable investment, and so had De Wolf thought it, or he would not have made so large an investment without an atom of security but what was to be found in his anticipations from the establishment itself. It is conclusive, that this was no heterogeneous disconnected article forced into the negotiation, but intimately connected with, if not the primary object of, the loan; that the price, however inflated, was that which both parties had, by previous unequivocal acts, set upon it; and if it could be said to have a market value, there is no evidence that it was above its market value; and, finally, that it was an actual transfer of interest with a view to acquire the article, and not merely to throw it upon the market in order to raise money. It was a real transaction, and not a subterfuge.

On the subject of the treasury notes and bills drawn on Philadelphia, we can perceive nothing usurious, or even unconscionable, in this part of the transaction. As to treasury notes, they were thrown into circulation as money, and it is an historical fact, that they were worth all they purported to be worth, notwithstanding the casual depreciation which the embarrassments of the country, and the scarcity of gold and silver, may have produced; and as to the bills on Philadelphia, we are induced to believe that payment in that form was a benefit conferred on the borrower.

From the well known course of trade between Kentucky and Philadelphia, it would scarcely have been possible, at that time, or perhaps at any time, to have suited them better in making a payment of money intended to be transported to, and used in, Kentucky. With regard to the bills, it is in evidence, that there was no loss incurred ; and, on the treasury notes, not as much as the transportation of gold and silver would have cost, calculating all the incidents to actual transportation. But what if these payments had been made in Rhode-Island bank bills? Would there have been a pretext of lurking usury in such a payment? Yet who can doubt that the payment would have been less convenient than that actually made? In all probability, with reference to gold and silver, and the exchange or depreciation in Kentucky, the paper of Rhode-Island would have been equally, if not more disadvantageous. It is not on such vague and equivocal grounds, that Courts infer the presence of usury. But there is one consideration with reference to this part of the cause, which is conclusive. There is no evidence in the record that these payments were in any way forced upon Prentiss. On the contrary, for any thing that appears in the evidence, it may have been, in both instances, the payment of his own choice. In a letter not long before the loan, he actually quotes bills on Philadelphia from four to six per cent. advance. Nothing of that chaffering appears in the cause, which distinguishes all the cases in which attempts are made to evade usury laws,

1825.

De Wolf
v.
Johnson.

at the moment of extorting extravagant profits on the advance of money.

With regard to the two payments made by way of rent, we have to remark, that there never was any payment of interest for two years on the 83,000 dollars, besides what was made in that form ; and had the payments been direct and absolute, and confined to the sum of 4,890 dollars each, there could no question have been raised respecting those payments. They would have amounted only to the legal compensation for the use of the money. With regard to the second year, it is obvious, that as yet nothing has been actually paid; but as it may be said to be secured or acknowledged by another bill, we will consider both sums as paid. And then the only exceptionable parts of the payment will be the sum of 498 dollars, added to that actually paid for the first year, and 174 dollars 30 cents added to the bill drawn for the rent of the second year. As to the cash, it is a simple allowance of interest upon a bill drawn for the 4,980 dollars, upon its being returned and taken up by another, and cannot be excepted to. And, as to the first, we perceive in the transaction about the second payment, a sufficient explanation of the origin of the addition made in that instance. As Prentiss acquiesced in having a bill drawn for the second year, payable in Philadelphia, we may reasonably conclude, that the agreement was to pay the rent or interest, which ever it may be called, by drawing such a bill. If, then, such a bill was drawn, and returned for non-payment, it may

afford an easy solution of the question upon what principle that addition was made.

But why. for so inconsiderable a sum, should we perplex ourselves with difficulties in so large a transaction? It could, at most, in common with all the items we have been examining, have furnished only a ground for a deduction, certainly not for dismissing the bill. Nor should we have proceeded to examine these items in detail, were it not that the Court below will have to make a decree upon which it will be necessary to allow or disallow these items. Nor, when it is considered under what circumstances this second contract was entered into, would this Court, upon slight grounds, be induced to open it.

The parties had previously entered into a contract avowedly usurious with relation to the interest reserved. The defendant intimates his intention to avail himself of the defence of usury, and the parties sit down together for the sole and express purpose of purging it of all usurious taint, and to arrange a new contract respecting the same loan which should be legally obligatory.

Is it, then, probable, that any deduction would have been withheld, which, by being retained, could affect the new contract with usury, or with any of the incidents of usury? Would De Wolf have trusted himself again in the hands of Prentiss, by mixing u. any thing with this contract on which a legal exception could be sustained? We think not.

But one of the counsel for the appellees has placed the objection to the complainant's right to

1825.   relief on a more general ground than the receipt
De Wolf    of usury, or the avoidance of the contract under
v.      statute. He insists, that it is enough for this
Johnson.   Court to refuse its aid, that the contract of 1815

How far a was prohibited by law, although not avoided by
Court of equi-
ty will lend its law.
aid to enforce
an    usurious    That a Court of equity will not lend its aid to
contract,
where the se- an illegal or unconscionable bargain is true. But
curities are not the argument carries this principle rather too far
avoided by the
local law.    as applied to this case. The law of Rhode-Isl-
and certainly forbids the contract of loan for a
greater interest than six per cent., and so far no
Court would lend its aid to recover such interest.
But the law goes no farther; it does not forbid
the contract of loan, nor preclude the recovery
of the principal under any circumstances. The
sanctions of that law are the loss of the interest,
and a penalty to the amount of the whole interest,
and one third of the principal if sued for within
a year. On what principle could this Court add
another to the penalties declared by the law
itself?

In the pre-    But the case does not rest here. The subse-
sent case, even
if the original quent legal contract of 1817, rescued the case
contract were
void, the sub- from the frowns of the law. Courts of justice
sequent agree-
ment to free will not shut the door in the face of the penitent;
it from the
taint of usury, and hence it has been decided, in a case very
rendered it va- analogous to the present, that although a con-
lih.
tract be in its inception usurious, a subsequent
agreement to free it from the illegal incident shall
make it good. (1 *Campb. Rep.* 165. note. 2
*Taunt. Rep.* 184.)

According to the views, then, which we have

exhibited of the case, the principal sum of the loan of 1815 was a subsisting debt at the date of the contract of 1817, and unaffected by any of the deductions contended for in the several items which we have considered. There was, then, a good consideration for the contract of 1817, and it is legally valid to the amount which it purports on the face of it.

But, if it were otherwise, there are two views of this subject, upon which the Court below ought to have sustained the bill.

It is very clear, that the Kentucky contract must be considered as a new and substantive contract. It is governed by a distinct code of laws from the Rhode-Island contract, and cannot be affected by the taint of usury which might have been transmitted to it under some circumstances, had it taken place in Rhode-Island. It was, then, equivalent to a payment and reloan; and no one can doubt, that money paid on an usurious contract, is not recoverable back beyond the amount of the usury paid.

Again, it is perfectly established, that the plea of usury, at least as far as to landed security, is personal and peculiar; and however a third person, having an interest in the land, may be affected incidentally by a usurious contract, he cannot take advantage of the usury. Some exceptions may exist to this rule under bankrupt systems, but they are statutory and peculiar.

Here, then, the case presents a third person, the assignee of an equity of redemption, setting up a defence, which, in one aspect, Prentiss him-

*The assignee of an equity of redemption cannot set up usury as a defence to a bill by the mortgagee for a foreclosure.*

self cannot set up; and which, in another aspect, he has not set up; but, on the contrary, under the state of the pleadings, must be supposed to have refused to set up, or have abandoned. These views are independent of the effect of notice, or of the peculiar circumstances of the notice in this case.

It is true, the Johnsons deny the notice prior to the deed of trust. But previous notice is immaterial, since the notice with which the law affects them, is that which the deed to Barry, under which they claim, communicates to him as assignee. In the actual case, the notice is peculiarly strong and pointed, since the only description of the lands in question, in the deed to Barry, is contained in a reference for description to the mortgage to De Wolf, and the purpose is explicitly declared to give priority to that mortgage. Technically and morally, therefore, they required no more than what should remain after satisfying De Wolf. But had they purchased from Prentiss, in the most absolute and general manner, and altogether without notice actual or constructive, they still could have acquired no more than the equity of redemption, and that would not have transferred to them the right of availing themselves of the plea of usury. We have examined the cases quoted to this point, and are satisfied with their application and correctness. It would, indeed, be astonishing, were t otherwise, for the contrary rule would hold out no relief to the borrower; it would be only transferring his money from the pocket of the

lender to the pocket of the holder of the equity of redemption.

Upon the whole, we are of opinion, that the decree must be reversed, and the cause sent back to have a decree of foreclosure entered, and carried into effect, according to the exigencies of the case.