Brockenbrough, J.
After an attentive examination of the bill, answers, depositions and documentary evidence in the cause, I have come to the conclusion that there were two loans of money by Povall to Johnson; that 5000 dollars were lent at one time, and 3000 at another; that the rate of interest reserved at the time of the loans was 10 per cent, per annum; that these two principal sums were consolidated in the bond of 8000 dollars executed by Turpin, and that the bonds taken and the deeds of trust executed to secure the repayment of the sums borrowed were infected with usury.
The epestion then is, what is the measure of relief to be extended to the appellant? Does the rule adopted in the case of Marks v. Morris, 2 Munf. 407. apply to this case? I will in the first place remark that the decision in that case, however much it may have been objected to, is now too firmly established to be shaken. It has received the sanction of this court in Martin v. Lindsay's adm'rs &c. 1 Leigh 449. and in Fitzhugh v. Gordon, 2 Leigh 626. Let us then endeavour to understand the extent of that decision. The borrower in that case had executed a deed of trust on land to secure the payment of the money borrowed, and the trustee was about to sell it for the purpose of discharging the debt. The borrower then filed his bill of injunction, in which he charged the usury and the rate of the usury, and averred that he could prove the usury by a witness whom he named, and that the deed of trust was executed to secure the payment of the usurious debt. He states that “ he is advised that by the laws of the land the aforesaid deeds of trust, being conveyances and assurances for the payment of money loaned, on which a higher interest is reserved than six dollars for the forbearance of 100 dollars and after that rate, are *98 not merely voidable, but are, ipso facto, utterly and also* lutcly void, and consequently that any sale under them would be of no effect or force in law or equity.” He then prays that the lender and the trustee may be' made defendants; “that they may, on their corporal oaths, full, true and perfect answer make to the premises as- fully as if they were particularly interrogated;” that the sale may be stopped, and all proceedings under the trust deed injoined; and that the trust deed may, “ by a decree of this honourable court, be declared null and void: or that he may have such further and other relief as may be just and equitable, and the nature and merits of his case may justify.” The answer of the defendant does not admit the usury, but states that the deed was executed to secure the principal with legal interest, and that a separate note was executed for another sum over and above the legal interest, •which note was voluntarily delivered by the borrower as a compensation to the lender for the inconvenience he might sustain from the deprivation of the principal sum, in case of a failure to return it at the time stipulated. The deposition of one witness proved the usury as set forth in the bill.
This court decided that the bill was not such a bill for a discovery and relief as is contemplated by the third section of the act against usury; and one of the grounds for this opinion was, that the plaintiff averred that he could prove the usury by a particular witness whom he named.
The court further remarked that the plaintiff, wanting no discovery, only found it necessary to apply to a court of equity to stay the trustee from selling, until the question of usury could be enquired into before some competent tribunal; and that the chancellor ought not to have imposed on him the loss of the principal sum, but should have injoined the trustee from selling, until the borrower should by some proper proceeding establish the validity of his contract.
*99 I will further remark that although the plaintiff did not by his bill demand that some proceeding should be instituted at law by the lender against him. in which he should have an opportunity afforded him of proving that the debt was usurious and void, but rather prayed that the deed might hy the chancellor be declared null and void, yet as he insisted that the deeds were utterly and absolutely void, the court decided that he was entitled to a trial before that tribunal which could alone declare the nullity of the contract on the ground of usury. This decision was justifiable under the prayer for general relief.
The effect of this decision I understand to be, that as by the operation of deeds of trust, which had become a usual and very extensive security for debts, the creditor had it in his power, by directing the trustee to sell the land, to coerce the payment of his debt without the intervention of a court of justice, and as the debtor had no day in court, to enable him to prove that the contract was usurious, and that the conveyance or assurance was utterly void under the first section of the statute against usury, 1 Rev. Code, ch. 102. p. 373. the court should give the debtor an opportunity, before a judicial tribunal, of invalidating the corrupt agreement and the assurance founded on it. By this course, the debtor by deed of trust is placed nearly on an equal footing with a mortgagor, or an obligor in a bond. In these last cases, if the mortgagee brings ejectment to recover possession of the land, or the obligee brings debt to recover the amount of the bond, the defendant has a day in court, and may defend himself on the ground of usury, and prove that the mortgage or bond is utterly void: or if the mortgagee files his bill to foreclose, the mortgagor may defend hirnseif on the same ground, and even in a court of equity may invalidate the instrument. But the trustee may, by the very terms of the trust deed, sell the land and convey to the ven *100 dee: unless equity interpose, the only remedy that the debtor has when the trustee is about to sell, is to hold on, and forbid the sale. But the moment he proclaims that the deed is infected with usury, he proclaims his own ruin. The cloud raised by a sale under such a proclamation would burst on his devoted head. His land would be sacrificed for a trifle, and he would be left with only the poor privilege of defending himself against the ejectment of the vendee, in which if he should happen to fail, the law would be to him more cruel than the most griping usurer. It was, then, to prevent the first section of the statute from being eluded by the ingenuity of creditors, and the new invention of deeds which could execute themselves, and in some sort to place the debtor by deed of trust on an equality with obligors and mortgagors, that this court made the decision in Marks v. Morris. They would not confine him to the remedy prescribed by the, third section of the usury law, 1 Rev. Code, ch. 102. p. 374. when he shewed by his bill that he did not rely on the conscience of the defendant to discover the usury, but could prove it by other evidence; and that he required that the contract and assurance should be annulled.
To bring a case, however, within the influence of Marks v. Morris, it is necessary that both of these averments should exist. The plaintiff should shew, first, that he has full proof which would avail him at law to defeat the claim of the lender, without a discovery by him; secondly, he should shew that he demands the annulment of the contract and assurance. On these requisites, the court will injoin and stop the sale under the deed of trust, till the creditor .shall establish the validity of the debt in the proper forum.
Both of these requisites are found in the bill filed by Marks against Morris. They are still more plainly set forth in Martin v. Lindsay’s adm’rs Sfc. in which the plaintiff avers in his bill that he can prove the usury, *101 and that the deed is by law null and void; and prays that the sale may be injoined, and that the court will extend to him such other relief as may be just. In Fitzhugh v. Gordon, the bill disclaims all benefit of discovery from the defendant, and expressly prays that the sale shall be injoined until the question of usury shall be tried at law.
In the case before us, I should be prompt to extend to the plaintiff the same measure of relief which was granted in the three above mentioned cases, but for the fact that he does not ask it. Although he says he is perfectly satisfied, and believes he will be able to establish the fact, that the money borrowed by Johnson was borrowed at an usurious rate of interest, yet he nowhere avers that the deeds are void, nor seeks to invalidate them on that account, nor prays for an opportunity to have their validity tried by the proper tribunal. On the contrary, he prays that the trustees and Johnson may reconvey to him upon such terms and conditions as are equitable; and general relief. Having elected so to charge (for which he may have had good reasons) it is not the province of the court to compel him, against his will, to have the validity of the deeds investigated by a court of law. The case then of Marks v. Morris, although good law, is not applicable to the present case.
Shall we then give to the lender his principal money only, under the third section of our statute against usury ? or shall we adopt the rule of the english chancery, and on the principle that he who seeks equity must do it to the same person, give him his principal and legal interest? In Spengler v. Snapp, 5 Leigh 478. the court decided that the third section did not apply to a case of a paid debt, and that the measure of relief in such case was the excess above principal and legal interest. But I do not think that this is true as to an unpaid debt. It has been suggested, indeed, that if there be a discovery by the defendant, he shall be *102 obliged to accept his principal, but if he make no dis- & . , r , \ , , covery, and the usury be proved on him by other eviden'ce, then he shall receive both principal and legal interest. The objection to this construction is that it holds out an inducement to peijury. It holds to the lender this language: tell the truth and admit the usury, and you shall have your principal money only; but deny the usury and be_ guilty of falsehood, and' although you be detected in it, yet you shall have principal and interest. This being the monstrous consequence flowing from that construction, it ought not to be admitted unless the words of the act are imperative. It has however been further suggested, that the discharge from all other penalties of the act will counterbalance this consequence; that on the admission of the usury by the defendant, it is true he will only receive the principal, but he will be discharged from the penalty of forfeiting the whole sum according to the first section, and double the money lent, at the suit of an informer, according to the direction of the second section: whereas if he denies the usury and it is proved on him, though he may receive principal and interest, yet he will still be liable at least to the penalty of forfeiting the double value, at the suit of an informer. I do not admit this last consequence. The second section, being a penal law, must be construed strictly, and applies only where the usury has been actually taken, accepted, or received. If it is only contracted to be taken, the penalty does not attach, nor will the information lie. This I think was clearly shewn by our late brother Carr, in his commentary on this statute in Spengler v. Snapp, 5 Leigh 507. If then, on a bill to discover usury, it is denied by the defendant, but proved on him, the mere discharge from the penalty aforesaid is of no consequence; since he has not yet tafeen, accepted, or received the usury, and if by the decree he is only entitled to the principal, or principal and legal interest, he *103 can never receive the usury, and never can be prose- . cuted under the second section.
Then it may be asked, of what use is the declaration that he shall be discharged from all other penalties of the act? is it entirely surplusage? To answer this question, it is necessary to resort to the rights of the parties under this third section. A statute had previously forbidden usury, and rendered invalid all assurances on which usury might be reserved or taken. Yet the borrower might, as in England, resort to equity for relief; where, however, he could not be admitted, unless on the principle that as he sought equity, he must do equity by paying principal and interest. He was also required to waive all penalties, if he required a discovery from the defendant; otherwise his bill would be demurrable, because no one could be called on to condemn himself. When he proffered the payment of the principal and interest, and waived the penalties of the act, the defendant might then be called on to answer. When this equitable practice was about to become a statutory regulation, it was deemed unnecessary for the plaintiff to waive the penalties and offer to pay the principal money borrowed; it was thought best that the statute should itself do that for him : and this seems to me to be the object of the clause in question. When the bill is filed, and the usury is proved, either by the oath of the defendant or the testimony of witnesses, all the penalties are waived (except the costs) aud the defendant shall receive his principal money alone, instead of principal and interest.
If this is not the true construction, then the borrower who seeks relief under the third section can get no relief at all by means of his statutory bill, if the defendant does not discover the usury. He has not pursued the requisitions of the english chancery bill; he has not waived penalties, nor offered to pay principal and interest; and although he has adduced full proof, *104 yet he must go out of court, and file a new bill on different principles. I cannot think that it was the intention of the legislature to compel a borrower to resort to these various experiments. I apprehend it was their intention, that when the courts of equity obtained possession of the subject, they should make a final disposition of it, so far as the plaintiff required equitable relief.
On the question whether this 'is to be considered as a Pennsylvania or a Virginia contract, and whether we shall adopt the relief afforded by the law of that state instead of our own, I shall content myself with referring to the opinion of the-president, the result of which I adopt as my own.
On the whole, I am for reversing the decree with costs, and entering a decree allowing to the appellee Povall his principal money only, after deducting the payments which have been made towards it.
Brooke, J.
This is the first case in which I have sat, which turned on the construction of the third section of the act against usury. In the case of Young v. Scott, 4 Rand. 415. the judges gave a construction to this section, which (with great deference) I do not concur in ; that is, that in every case in which the plaintiff prays relief against a usurious contract, the lender, if the usury is proved or confessed, must lose his interest. On the contrary, I think the plain meaning of the third section is, that upon the discovery, he shall lose his interest, and be discharged from all the penalties of the act; the latter being full compensation for the former, and leaving his conscience free to declare the truth. I think it clear upon the words of the section, that the legislature so intended, and did not intend to reverse the rule that he who seeks equity must do equity, in the case of the plaintiff asking relief against the usury upon other proof than the lender’s answer. The words *105 of the third section are, “ Any borrower of money or goods may exhibit a bill in chancery against the lender, and compel him to discover upon oath the money or thing really lent, and all bargains, contracts or shifts which shall have passed between them relative to such loan or the repayment thereof &c. and if thereupon it shall appear that more than lawful interest was reserved” — (how appear ? surely nothing can be clearer— upon the answer confessing the usury, and not upon other evidence proving it, or the legislature would have said so) — “ the lender shall be obliged to accept his principal money without interest &c. and pay costs, but shall be discharged from all other penalties of this act.” It certainly did not intend to discharge the lender from all the penalties of the law, in a case in which the usury was not confessed by the answer, but proved by other evidence, as in the case before us. The whole object seems to have been to ferret out the usury when it could not be otherwise proved than by the answer of the defendant, and not to release the borrower from the payment of the principal and interest, according to the settled rule of equity, in other cases. This, it is said, would hold out a temptation to the lender to deny the usury, and to peijure himself. But of this the legislature had a right to judge, even if it were so. To one, however, who had violated the law, a release from all its penalties would be a consideration of some importance, and in most cases would outweigh the amount of legal interest on the principal sum lent. On this construction, though on the other points I concur with the court, 1 think the demee in the case before us is correct and ought to be affirmed.
Tucker, P.
This is a bill filed for relief against a usurious contract, and, as usual, presents great difficulties as to the facts in the case. [Here the president stated and minutely examined the evidence.]
*106 If the inferences drawn from the conflicting, unsatis- ° r factory and evasive testimony furnished by the answers ' and depositions of the agents in this transaction are just, we are brought to the conclusion that in January 1823, Johnson was debtor to Povall in the principal sum of 8000 dollars, for which Turpin became bound, and the payment of which he secured by deed of trust. We also conclude that the original loan was for the usurious interest of 10 per cent. What must be our judgment on this stale of facts ? This must be decided by adverting to the pleadings.
The bill in this case sets forth the usurious lending, and demands that the defendants may “fully answer all and singular the allegations contained in it:” and then it prays a reconveyance of the trust premises, and a surrender of the bond for 8000 dollars “ upon such terms and conditions as are equitable,” and “ such further relief as is agreeable to equity and the nature of the plaintiff’s case.”
This bill has no analogy, I conceive, to those which fall within the influence of Marks v. Morris, 2 Munf. 407. Of the correctness of the general principles decided in that case I have never had a doubt, and I beg leave to refer for my view of it, and of the cases of M’Pherrin &c. v. King, 1 Rand. 172. and Stone v. Ware, 6 Munf. 541. to a very full statement of my opinions upon them elsewhere. 1 Tucker’s Com. 368-371. I shall not be suspected, I am sure, of quoting what is there said, as authority. The reference is made, merely to avoid unnecessarily increasing the length of this opinion. A few remarks however are required in addition.
A borrower who has contracted to pay usurious interest may present his case to the consideration of a court of equity under various aspects. If he has executed a deed of trust for the payment of the money, which is about to be carried into execution by sale, and if he is *107 full handed with proof, he may then file his bill upon • .the principle of Marks v. Morns, not asking the court of chancery to enquire into the usury, and to give relief against it, but merely demanding that he may not be prevented by this newfangled judgment bond from having a day in court to defend himself at law. In such a case the court does not try or decide the question of usury, except so far as to ascertain that there is some foundation lor the application, but only provides that a proper proceeding be instituted by the creditor, for the purpose of deciding on the validity of the instrument ; and according to the result of that proceeding, it dissolves or perpetuates the injunction.
The plaintiff however may not be full handed with proof, and in that event he must resort to the conscience of the defendant, and his case will fall within the provisions of the third section of the statute of usury. If however, falsely calculating on his strength, he demands not relief in equity, but the institution of the proceeding at law, he may upon the trial find himself embarrassed, not only for want of evidence, but by the rigour with which the law holds the defendant, who pleads usury, to the obligation of setting forth the usurious contract with the utmost precision, and of proving it moreover precisely as laid. In a case decided some time since (Crenshaw’s adm’r v. Clark &c. 5 Leigh 65.) I adverted to this principle of law, and endeavoured to shew that it had a tendency to bring about justice in the end, since the borrower, if he fails in his defence, may still get rid of the usury in equity, hut will be obliged to pay his principal.
As, however, the borrower incurs a hazard by resorting to the course pointed out in Marks v. Morris, he may surely be permitted to waive that rigorous procedure, and come into court upon its equitable principles, modified as they now are by the act of assembly. Even if he had no interested motive in doing so, equity would *108 not complain of his willingness to pay up what was due. It would not gratuitously force him to proceed according to the principles of Marks v. Morris, and to absolve himself from the whole demand, when he does not ask it. Of this we have evidence in the opinion of one of the judges in Scott v. Young, 4 Rand. 415, 422. Nor do I conceive a court of equity should interpret the bill of the plaintiff (unless its terms are too strong to admit of doubt) into a willingness to encounter a hazard on the one hand, or to do a great iniquity on the other; and therefore, although I defer to the principles of Marks v. Morris and Martin v. Lindsay's adm'rs &c. yet I cannot think it proper to apply them except where such application is distinctly solicited. In that respect, perhaps those cases have gone farther than their own principles will warrant.
Admitting, then, the right of a party seeking relief against a usurious deed of trust, to pursue his remedy according to Marks v. Morris, or under the third section of the statute and the general principles of equity, it may safely be affirmed that this election is to be determined by his bill, and that in this case it is most clearly and distinctly manifested. For the bill does not dispense with a discovery, but calls for it. It does not ask the institution of a proceeding at law, but distinctly asks the direct action and relief of equity. It does not demand that the debt shall be spunged, but that the bond shall be rendered up “on such terms and conditions as are equitable;” thus throwing the party upon the equitable principle of the court (as modified by the statute) which compels the borrower in every instance to pay up the principal of his debt. Such I conceive must be the decree here, unless upon the notion that this is a Pennsylvania debt, and that therefore the lender is entitled to interest.
It is with great reluctance that I touch upon this important matter, in a case in which the question certainly *109 has not been fully and fairly presented. The bond for 8000 dollars was unquestionably executed m Virginia, as was also the deed of trust which the lender is seeking to enforce; and if he designed to fence himself from the operation of the Virginia law by the fact that the contract was made in Pennsylvania, he ought to have put that matter directly in issue, not only that the plaintiff might have had an opportunity of contesting it, but also that the proper and legitimate course might have been taken for ascertaining what, in point of fact, was the law of Pennsylvania. For my own part, I do not profess to know it; and if I did, I could not know it judicially from this record. I should therefore incline to send the cause back, if I thought there was any reason to suppose that any new and advantageous light could be thrown upon the subject. But believing that the result must be the same though the Pennsylvania law be as it has been alleged to be, I think it better to decide the case upon that admission.
There is no question that the bond was executed in Virginia, and that it is the only contract by which Turpin was bound for the payment of its amount. It is then a Virginia contract, unless it be true that, having been executed for a bona fide Pennsylvania debt, it. is to be considered as ancillary merely to the Pennsylvania contract. Thus it is said, if money be borrowed in New York for 7 per cent, interest, the payment may be secured by mortgage on Virginia property, and such mortgage will be enforced; for as the original loan was lawful, and might be recovered by judgment in our own courts, so, a fortiori, a security for the loan by a mortgage. (which is only a collateral and accessory or dependant contract) ought to be held good. This was decided in De Wolf v. Johnson, 10 Wheat. 367, 383. in which the auxiliary contract of mortgage was held to follow the principal contract of loan, which took place in Rhode Island, though the mortgaged premises were in Kentucky. *110 To this doctrine I accede, as it seems to me reasonable and proper. See also Story’s Conflict of Laws 238.239. 2 Kent’s Comm. 460, 461. It is further said that if a security by way of mortgage shall be held valid in such case, a bond with personal security must in like manner be so held. This I take to be a non sequitur. The mortgage is strictly accessorial. The parties to the contract are identical with those between whom the original borrowing and lending took place. But the new bond is a new contract. It is a contract in which there is a different contracting party introduced, and it is one by which the former contract is not sustained, but annihilated; for on the execution of the new contract the old bond is given up. It is not therefore wonderful that such new bond has been, in some cases, considered as governed by the law of the country where it was in fact executed. Thus in Dewar v. Span, 3 T. R. 425. the bond sued on was executed in England, as a substitute for a former bond executed at the island of St. Christopher, where interest was six per cent. The substituted bond provided accordingly for the payment of 6 per cent, interest, and was held void for usury, as it was executed in England, and therefore an english contract. On like principles lord Mansfield determined, in Bodley v. Bellamy, 1 Blac. Rep. 267. Burr. 1094. that though a bond made in India, and providing for indian interest, was good and might be enforced, yet when the judgment upon it was entered, the indian interest ceased, and it carried interest from the date of the judgment at the rate of 5 per cent. only. So it has been held that though a contract was made in Ireland, upon which a bond was given, yet if the bond were given in England, irish interest could not be claimed. Ranelaugh v. Champante, 2 Vern. 395. Comyn on Usury 154. And in another case, where a mortgage was executed in England upon lands in the West Indies, and more than english interest was reserved, it was usury. Stapleton v. Conway, 3 *111 Atk. 727. 1 Ves. scn. 427. Steel v. Sowerby, 6 T. R. 172. n. cited Comyn on Usury 155. in note. Accordingly, in the interesting work of justice Story on the conflict of laws, although ho considers the collateral security of a mortgage as good, he seems to follow these decisions in saying, “Suppose a debt is contracted in one country (New York) and afterwards, in consideration of further delay, the debtor, in another country ( Virginia) enters into a new contract for the interest allowed in the country where the debt was contracted (New York) but higher than in the country (Virginia) where the new contract is made. Is the stipulation invalid ? It has been decided that it is. In each of these cases the lex loci contractus governs as to the proper rate of interest.” Upon these authorities, it would seem that the bond in this case was clearly a Virginia bond, and must be governed by Virginia law. And yet my mind is by no means satisfied with the doctrine, since the new contract is obviously executed in reference to the law of Pennsylvania, where the loan was made; and where that is the case, it would seem that the contract is to be governed by the law of the place of reference, and not by that of the place of execution. I shall not therefore rest my opinion on this point, though I have thought if: proper to offer my views of it.
Secondly, admit that this was a Pennsylvania contract: we are next to enquire whether he who is convict of a gross violation of the Pennsylvania law is entitled to cover himself with its panoply? The principle upon which the lex loci contractus is permitted to give the law of the contract, is not a mere principle of comity: it is the result also of the just principle of carrying into effect the intention of the pa rties. For it is a fair inference that when two parties contract, they do so in reference to the law of that country in which they happen to be; but where in point of fact they contract in reference to the law of another country, the law of the *112 latter will govern in preference to the law of the place ___ of the contract. To entitle the party, then, to invoke the law of the place of the contract, it must appear that the parties contracted in reference to that law, or at least it must not appear that they contracted without such reference. Upon what principle, then, can the violator of the law insist that his contract was made with reference to the law, and that it must be governed, by it ? Does it follow that because a contract made in New York for 7 per cent, interest is good, since it is made with reference to the law of that state, which sanctions it, we should also apply the law of New York to the construction or enforcement of a contract which has no reference to it, but is entered into in defiance of it? By no means. A contract made in any state, contrary to its laws, must in every other state be looked upon as uninfluenced by them, and must therefore always fall within the influence of the lex fori. The foreign state can indeed only act upon the question remedially. It disclaims the power or jurisdiction to carry into execution the penal laws of the offended state. But where it is called upon to protect its own citizens. from the force of a contract entered into in violation of the law of the place of contract, and expressly against the policy of our own laws, it must carry into effect the remedial and salutary provisions of our own acts of assembly, instead of affording them. the more scanty protection of a foreign law. It could not be endured that a griping usurer of a northern city should be permitted by the judgment of our own courts to recover the full amount of his principal and interest, though, for the protection of our people, we have declared that the usurer shall lose his interest. The contract, wherever made, and wherever the money was payable, was to be enforced here. The party must have looked to our forum for redress in case of default of the debtor, and he must of course be governed by the law of that forum *113 in relation to his remedy. We cannot give him a remedy for more than his principal. We are not bound to recognize or enforce a vicious contract, injurious and indeed ruinous to our own people, except upon the terms and conditions which our own legislation has imposed. The comity due from one state to another extends not so far. Story on Conflict of Laws, p. 203. The usurious contract in this case, though not punishable by our law, because not entered into in Virginia, is in violation of our law, and not protected by any other; and in such case the rule must be, “ ma.gis jus nostrum quam jus alienum servemus.”
I am therefore, after a most anxious consideration of the whole subject, of opinion that the Virginia law must prevail; that the decree should be reversed, and the injunction dissolved for the sum of 5530 dollars, without interest, and perpetuated for the residue.