Brockenbrotjgh, J.
The bill charges that gross usury was practised by Christian Stover upon the plaintiff Snapp, and that the two mortgages of June 1800 were executed for the purpose of securing the usurious debts. We have *485 not the benefit of the answer of the person charged with the usury, as he was dead before the suit was brought. His representatives were not privy to the transaction, and they call for full proof of the corrupt agreements. There are sundry witnesses who testify to the distinct acknowledgments of Christian Stover as to the character of the loans and the extent of the usury. [Here the judge stated the evidence]. I am of opinion, that this evidence is sufficient to support the allegations of the bill, touching that subject, and that the chancellor did not err in deciding that twenty per cent, was the rate at which the money was loaned; indeed, I think the estimate is too low.
The next question is, whether the sale made under the deed of trust, which was executed to secure the debt of 1000 dollars to Joseph Stover, ought to be set aside. The chancellor was of opinion, that the sale was improperly made whilst the suit in Shenandoah county court, which Christian Stover had brought to foreclose the mortgages on the same land, was pending. But neither Joseph Stover, nor Cook, the trustee, were parties to that suit. It is true that in June 1804, a few months after that suit had been commenced, the plaintiff in that suit obtained leave to make them parties, but in August following, the suit was dismissed as to them, and the bill was not amended in that particular. During the short period in which they were parties, Snapp had not answered, and, consequently, there was nothing in that suit which could possibly affect Joseph Stover, nor give him notice of Snapp’s defence, nor of his equity. I cannot perceive why the pendency of that suit 'should present any obstable to Joseph Stover’s proceeding to sell under his deed of trust. Nor indeed do I find any evidence to prove, that up to the time of the sale, or at the sale, Joseph Stover had any notice of Snapp’s equity against Christian’s two mortgages. That sale was made in April 1805. In the preceding August, Snapp had presented his bill to the court of chancery of Staunton, to restrain Joseph Stover from selling under his deed of trust, and there were two grounds on which he asked for the injunction: first, that he had signed *486 the deed, believing it to be a mortgage, and not a deed of trust, in which he had been deceived ; and secondly, that the whole of the money which the deed was executed to secure, was not due: he also prayed, that the trustee might be restrained from selling more of the land than was sufficient to pay Joseph Stover’s debt. The injunction was refused on the two former grounds, but granted for the latter purpose. It was dissolved in November 1804, and the bill dismissed in 1805, just before the sale. It is to be remarked, that, in that bill, Snapp did not mention his mortgages to Christian Stover, or make any suggestion, or give any notice to Joseph, that he had any equity against them. Nor did Snapp give any notice to the trustee, nor to Joseph Stover, nor to the bidders, at the time of the sale, of any objection to those mortgages. He did, indeed, object to the sale, but it was on one of the grounds on which he had been defeated by the chancellor. He insisted that only so much of the land, should be sold as would be sufficient to satisfy the deed of trust. The land was offered for sale under the deed, subject to the incumbrance of the prior mortgages; and although the fairest opportunity was then presented to give notice to both the trustee and cestui que trust, of his objection to those mortgages, yet not a word was said on the subject. There was not, then, any valid objection to the sale on that score.
Was the sale unfairly conducted? At this distance of time, and after an interval of sixteen years between the sale and the commencement of this suit, it is probably difficult to get at the exact truth. But according to the evidence, it appears to have been a public sale, duly advertized: there were eight' persons present, including the trustee: four of the company were monied men, able to purchase the land: two of those persons, bid for it, and there was another bidder who was not a monied man. The land was cried out to the cestui que trust. But the best evidence that it was not an unfair sale is, that the price given for it, if not full, was not grossly inadequate. The incumbrances were considerable, and it was sold, as it necessarily must have been, *487 subject to the prior incumbrances. The debt of Joseph Stover was 1000 dollars with interest from August 1800, and that of Christian Stover was 5000 dollars with interest from June 1800. The sale was for cash, and according to the evidence, it could not have been sold on a credit for much more. The purchaser, whoever he might be, was obliged to consider Christian Stover’s debt as wholly due, and unimpeached. Whether there was any usury in it or not, was a question between Snapp and Christian Stover, which it was not safe for the purchaser to trouble himself with. If he had known, that Snapp had charged that the debt was infected with usury, yet he could not know how it would be ultimately decided, and if it should happen that the decree of the court should be in favor of the purity of the debt, the purchaser would be obliged to pay to the incumbrancer, the whole amount of his lieu; the principal with the accumulated interest. It has not, therefore, been proved that there was any fraud in the sale. It is true, that we are apt to suspect from the relation subsisting between the Stovers, that there was some secret understanding and a combination between them, to get the land of Snapp, in exchange for an usurious debt. But suspicion is not proof, and however griping and oppressive the conduct of Christian Stover may have been, there is nothing proved against Joseph, that is hard or unfair. He waited several years for his money, after he might have compelled a sale; his debtor threw obstacles in the way of his recovering it, which it cost him some trouble and expense to remove; and, finally, he gave a fair price for the land, at a public sale.
If Joseph Stover had continued the owner of this property (as he did for two years), I do not think it possible that, without further proof of combination than this record presents, any application could have been listened to, for the purpose of depriving him of the benefit of his purchase. Christian Stover was the derivative purchaser from him; and although he was fully apprised of Snapp’s objection to his mortgages, and of his equity against them, yet he must stand in the place of Joseph, the original purchaser without *488 notice of that equity. Sugd. Law Tend. 531. The fact of that derivative purchaser being himself the usurer whose incumbrance was objected to, was a circumstance that had great weight with me, at first, in inducing a very strong suspicion that there was a combination between the two brothers to produce a fraudulent sale, and caused me to hesitate on the question of vacating it; but I am now satisfied, that that circumstance alone is not sufficient to fix a fraud on Joseph Stover, the original purchaser, or to deprive the purchaser from him of his bargain.
I do not think that Snapp can complain that the sale is not vacated: his own laches would probably have been sufficient to prevent that result, if it would have been otherwise proper. He waited from 1805 till 1821 without bringing a suit. In the meantime Christian Stover has died, and has devised this land to one of his children, as her portion of his estate. After so great a delay, I do not think that the sale should be disturbed. Gregory v. Gregory, Coop. Ch. Rep. 201.
The allegation in the bill, that both Joseph Stover and Christian Stover had promised that they would restore the land, as soon as their respective debts should be paid from the rents and profits, is not supported by the proofs, and therefore must be disregarded.
Although the sale should not be disturbed, yet relief should be extended to Snapp, on the ground of usury. The objection of time does not lie to this relief. The controversy respecting the usury was kept up in the county court of Shenandoah, from 1803 till December 1818; it was not till this last period that the bill in that court was dismissed by the executors of Christian Stover. Immediately after that, the writ of right was brought, by the judgment in which, Snapp lost the hold he had on the last remnant of his land. Without losing any further time he instituted this suit.
Then, what is the measure of relief to be extended to him 1 I am of opinion, that, as the debt in this case was not outstanding, but must be considered as having been paid on the 6th April .1805, when Joseph Stover purchased the' *489 land subject to the liens of Christian Stover on it, the appellee Snapp is entitled, on the principles of equity, and according to the decision of this court in Clarkson’s adm’r v. Garland, 1 Leigh 147. to recover back from the executors of Christian Stover, the excess which was on that day so paid to the lender, above the principal and interest due to him, with interest on that excess till paid, with costs in both courts. I am also of opinion, that the appellants, Spengler and wife, should be quieted iu their possession of the land, and recover their costs in both courts against Snapp. Therefore, the chancellor’s decree should be reversed, and a decree entered upon these principles.
Cakjr., J.
There are two questions in this cause: 1. Shall the sale of Snapp’s land to Joseph Stover, be set aside? 2. Was there usury in the two debts of £1000. and £500. to secure which the mortgages to Christian Stover of June 1800 were executed ? If there was no usury, Snapp has no claim to relief of any kind. Without recapitulating the evidence, I shall say, I agree with the chancellor, that the transactions between those parties were usurious. The evidence is in some degree vague, yet it is sufficient to fasten the conviction on my mind, that for a series of years, there was, from time to time, a borrowing and lending, in which there was griping usury practised; and that this practice extended to the debts for which the mortgages were given. The chancellor has fixed the excess at twenty per cent. and 1 shall not differ with him on this point. Nor do I think, that, under the particular circumstances of this case, especially the pendency of the suit brought by Christian Stover to foreclose, in which this question of usury was raised, the delay in filing this bill ought to prevent the plaintiff from getting relief against the representatives of Christian Stover, for the excess beyond legal interest.
The question is, how shall this relief be given ? Shall it be by setting aside the sale of the land, and taking an account of rents and profits ? The chancellor has said, so, but in this I differ with him entirely. Sixteen years elapsed *490 between the sale of the land and the filing of this bill. In the interval, the vendee sold it, and the second vendee died, having held possession, without a claim, until in 1818. He devised it to his daughter by his will, dated in 1817. Under these circumstances, the vice in the original sale must be gross and palpable, and the excuse for delay most satisfactory, to justify equity in setting aside the whole proceeding; turning into tenants, men who had considered themselves owners, and disappointing the family arrangement, founded on that supposed ownership. I shall not cite again the cases shewing the weight given to time, under such circumstances, but content myself with referring to my opinion in the case of Carr v. Chapman, lately decided, ante 171.
Let us look now to the facts attending the sale. In August 1800, a few months after the mortgages to Christian Stover, Snapp executed a deed of trust of the same land, to secure the sum of 1000 dollars to Joseph Stover. In August 1804, the trustee being about to sell the land, Snapp filed a bill in the court of chancery of Staunton to stop the sale. The objections taken in that bill were, 1. that the plaintiff meant to give a mortgage, and supposed he was executing a mortgage, when he executed the deed of trust; 2. that he did not owe Stover as much as 1000 dollars ; and 3. that they were about to sell the whole tract, when a part would pay the debt. The chancellor granted the injunction. It was answered, and disproved in every point: the answer, among other things, disclosed the fact of the two previous liens of Christian Stover, and stated this as a reason why the whole must be sold, as the sale would be subject to those liens. Notwithstanding this disclosure, Snapp produced no evidence to impeach those liens at that time, and the injunction was dissolved. In 1805, the trustee again advertised, and in April 1805, a sale of the land was made, at which Joseph Stover became the purchaser. The land was proclaimed to be sold, subject to the liens of Christian Stover; and Joseph gave for it the amount of his own debt, took possession under the sale, got a deed from the trustee, and in 1807, sold to Christian, who (as before *491 stated) held it till his dentil. The objections to this sale, in the present, bill filed in 1821, are, 1. that there were no bidders, and consequently that the land was sacrificed, being sold at a sum greatly under its value; 2. that the purchase by Joseph Stover, and his subsequent sale to his brother, was a plot contrived between them to extricate the usurious claims of Christian from the danger or difficulty which attended the collection of them. With respect to the charge that there were no bidders, it is in full proof, that there were eight persons present, four of whom were monied men, able to buy, and that three or four persons were bidders, and though many witnesses, nearly all who were present, were examined, not one of them has made the slightest charge of fraud or unfairness in any part of the sale. They say, that Snapp said he was willing to pay all the liens, but insisted, that only a part of the land should be sold. Some of them say, they thought the land sold for too little; others, that they would not have given the amount of all the liens for it. As to the price, Joseph Stover buying subject to Christian’s liens, and no objection being taken to them, must be considered as giving for the land, the full amount of the three liens. The case of De Wolf v. Johnson, 10 Wheat. 362. decides, that the plea of usury is personal, and that a purchaser of land, with a lien on it,, cannot shew that such lien is usurious, but must pay it, as a part of the price of the latid. Thus, the purchase money was about 7800 dollars ; and this, according to the evidence, was not far below the value; no greater sacrifice than every man must expect to make, who has to suffer a forced sale of his land. With respect to the charge of conspiracy between the brothers, there is not a shadow of proof to support it, except the fact that they were brothers. Surely this is not enough. It will be remarked, that there is no charge in this bill, against the debt due to Joseph Stover: his claim is admitted to have been entirely fair. If this bill, then, had been recently brought, I see no ground on which Snapp could have succeeded in setting aside the sale, though possibly it might have staid it, till the character of Christian Stover’s claim *492 had been settled, if Snapp had chosen to file a bill with ' that object; but this we see he would not do, though in a manner invited to it by the answer to his bill in the court of chancery of Staunton. But upon this bill filed in 1821, without the shadow of an excuse for the delay, and Snapp residing all the while on the very land,—after too, both the Stovers had gone to their graves, and the land was in the hands of innocent devisees,—-I can never consent to setting aside the sale.
How then shall we relieve Snapp against the usury? My opinion is, that we should deduct the twenty per cent. excess from the two debts due to Christian Stover, having allowed him legal interest on the debts justly due him, up to the sale of the land by Joseph Stover to him, and charge interest on such excess from the sale by Joseph to Christian; and for the balance a decree should be entered against the executors of Christian Stover, with all the costs of this suit.
Brooke, J. I concur in the opinions that have been delivered in all respects.
Cabell, J.
I also concur in the opinions of my brother judges upon the main points, but I doubt as to the measure of relief. I incline to think, that this must be regarded as an application to equity for relief against usury in a debt outstanding and unpaid, under the 3rd section of our statute, 1 Rev. Code, ch. 102. p. 374. My brethren think, that the debts that were due to Christian Stover, were paid by Joseph Stover’s sale of the land to him in 1807. I do not concur in that view of the transaction.
This last point, whether the debts secured by two mortgages of June 1800 to Christian Stover, ought to be considered as having been paid by the sale of the mortgaged subject by Joseph Stover to Christian, or as debts yet remaining unpaid (upon which the question as the proper measure of relief depended), had not been argued; and, at *493 Johnson’s instance, the court directed an argument of this ... ,1 point, m the cause.
Slanard argued, for the appellant, that when Joseph Stover purchased land at the trustee’s sale, subject to the prior incumbrances, the debts due on those prior incumbrances were part of the purchase money he contracted to pay for the land. He had no right to impeach those prior incumbrances, on the ground that the debts due to the prior incumbrancer were usurious, even if ho had had notice of that objection to them; De Wolf v. Johnson, 10 Wheat. 365. However, he made the purchase, without any notice of any objection to the claims of Christian Stover. Indeed, Snapp, who was present at the sale, instead of urging the objection, declared his willingness that the previous incumbrances, that is, the mortgages held by Christian Stover, should be satisfied. Joseph Stover, therefore, had no right to question the claims of Christian, and no reason to doubt the fairness of them: he ivas hound to pay them : he had a right to pay them in tire most convenient manner he could: he did pay them by a sale of the land to the prior incumbrancer. Snapp had notice of this, at least as early as 1807: he did not complain for near sixteen years. Therefore, the debts due on the mortgages to Christian Stover were in fact paid in the sale made by Joseph to Christian, and paid, moreover, with Snapp’s knowledge, and without any objection from him, certainly, if not with his assent; so that the case fell clearly within the principle of Clarkson’s adm'r v. Garland, 1 Leigh 147.
Johnson, for the appellee, contended, very strenuously, that the mortgage debts to Christian Stover remained yet unpaid, and that the case, as to the proper measure of relief, fell within the principle of Young v. Scott, 4 Rand. 415. He said, the question was, as between Snapp and Christian Stover, whether the sale of the mortgaged land by Joseph Stover to Christian, could be regarded as a payment of the debts secured by Snapp’s mortgages of the land to Christian ? ' The mortgaged land, certainly, was not the debtor: Snapp was the debtor of Christian Stover. Joseph Sto *494 ver had no right to pay Snapp's debts to Christian, without express authority from him to that purpose: he could not, by making such payment, constitute that a debt, which Snapp did not admit to be a debt: he could not by making payment to Christian, nor could Christian by receiving payment from Joseph, deprive Snapp of his legal objection to Christian's claim. And, he said, it was quite obvious, that neither Snapp nor Christian Stover regarded Joseph Stover's sale of the land to Christian, as a payment of the debts due him from Snapp,—in other words, as an extinguishment of his claims upon the mortgages: for, at the very time of that transaction, Christian was prosecuting a suit in chancery to foreclose Snapp's equity of redemption of the land, and Snapp was resisting the claim on the ground that the debts were usurious; and, after the sale made by Joseph to Christian, which it is now contended amounted to a full payment of the mortgage debts to him, and to a satisfaction and extinguishment of his claims under the mortgages, Christian continued to prosecute his suit for a foreclosure of the mortgages, and Snapp persisted in his defence of that suit, till Christian's death in 1818. During all this time, then, neither of the parties to the contract, neither debtor nor creditor, regarded the mortgage debts as paid. Could the court regard the sale made by Joseph to Christian Stover, as a payment of Snapp's debt to Christian, when Snapp was earnestly contesting Christian's claim, and when Christian himself did not accept the transfer of the title of the mortgage subject to him, as a payment? Supposing the representatives of Christian Stover, instead of dismissing the suit against Snapp to foreclose the mortgages, had persisted in prosecuting it to a hearing, and the court had decreed, that the mortgages were usurious, and therefore null and void,—could the representatives of Christian have said, that they were nowise affected by such a decree, that the debts had been long since paid, that they were entitled to hold the land which they had received in payment of the debts, and that Snapp must now seek relief in equity against the usury which had *495 already been paid by him ? If not, then, how could the dis-mission of the suit in 1818, make the sale of Joseph Stover to Christian in 1807, a payment of the mortgage debts, which previous to the dismission, and but for the dismission, were certainly outstanding and unpaid debts? As to the declaration imputed to Snapp, at the sale of the trustee Cook to Joseph Stover, that he was willing the debts due on the previous mortgages should be paid, that could only be understood to mean, that he was willing the sale should be made subject to those mortgages,and that the aggregate of the mortgage debts should be regarded as part of the purchase money to be paid by the purchaser; not that he waived his objection to the legality of the mortgage debts, or gave the purchaser authority to pay those debts for him. That he did not mean to waive his objection, or to authorize the purchaser to pay the mortgage debts for him, was proved by the fact, that he, at the very time, insisted that no more of the land ought to be sold than would suffice to satisfy Joseph Stover's claim. This was enough to have informed Joseph Stover, that Snapp did not intend to authorize him to pay the mortgage debts due to his brother. Here, then, he said, was a question, whether mortgaged debls claimed by Christian Stover of Snapp, were paid by Joseph Stover in a sale of the mortgaged subject to Christian,—when Joseph knew that Snapp, the debtor, was unwilling the debts should be paid,—■ when Christian, the creditor, did not consider it as a payment, but continued for years afterwards to prosecute a suit to coerce payment,—and -when Snapp, the debtor, was unwilling the payment should be made, and persisted in resisting the claim of the creditor ? If this debt was paid, it was paid by a third person without authority, for a debtor who was resisting the payment and contesting the debts, to a creditor who did not know that he was receiving payment. The fair view of the transaction was simply this—Joseph Stover purchased the land at the sale made by the trustee, under the deed of -trust executed by Snapp for his security, and the consideration money he was to pay, was the aggregate of the debt due to himself, and of the debts for which *496 the two previous mortgages to Christian Stover had been executed. This latter part of the purchase money he was bound to pay to Christian Stover, if he had just claim to the same under his mortgages, and if he had not,, then to Snapp. And when Christian Stover purchased the land of Joseph, he stood in Joseph's place; he was entitled to retain this part of the purchase money to himself, if his mortgages were valid, and if they were not so, bound to pay it to Snapp. It was a question to be settled between Christian and Snapp, which of them was entitled to this part of the purchase money; and a question then and long after-wards in litigation between them. Now, it turned out, by the judgment of this .court, that, in that litigation, Christian Stover ought not, and Snapp ought, to have been held entitled to the money; and yet it was contended, and that too as between Snapp and Christian, that the money had been paid, to the latter.
Brocxcen.bb.ough, J.
At the last term of this court, I gave my opinion in this case, on all the questions which appeared to arise in it, and to that opinion I now refer. One of the questions that arose was, what was the proper measure of relief to which Snapp was entitled ? the mortgages executed to Christian Stover in 1800 having been decided to be usurious. I was of opinion, as was a majority of the court, that, as the land was sold on the 6th April 1805, under the deed of trust to Joseph Stover, who became the purchaser of it subject to Christian Stover's prior liens, and as Joseph Stover, at a subsequent period, sold the equity of redemption in the land, and gave possession of the land itself to Christian Stover, who continued in possession of it during his life, and at his death devised it to his daughter, the debt secured by those two mortgages could not now be considered as outstanding, but must be held to have been paid on the day of the purchase, and that Snapp ought to recover back from the executors of Christian Stover, the excess so paid above the principal and legal interest due to him, with interest on that excess from that day till paid. The *497 counsel for the appellee contended, that the mortgage debt ought to be considered as still unpaid, especially pending the suit in Shenandoah, and that the measure of relief was to calculate the interest on the nominal amount of the mortgage debt up to the day of sale, and from the aggregate of the principal and interest to deduct the principal without interest, of the sum actually loaned, and on that excess to give Snapp interest from that time till payment. The difference in the two measures of relief is very considerable, as will be apparent from calculation. As this subject had not been discussed in the first argument, the cpunsel obtained leave to bring it before the court, and the question whether the mortgage debt is still outstanding, or whether it must be deemed to have been paid, has now been fully argued.
Before I. give my opinion on that question, I will advert to another which is intimately connected with the one before us; namely, whether, where a borrower of money on usury has actually paid off and discharged the whole usurious debt, and files his bill in equity against the lender for relief, he is entitled to recover back the excess paid over ancj above the principal money lent, with interest on that excess, according to the 3rd section of our statute against usury i or whether he is only entitled to the excess with interest, over and above the aggregate of the principal and legal interest of the money actually lent, according to the principles adopted and invariably acted on by the courts of equity in England ? In other words, whether the 3rd section of our statute applies to a case where the borrower seeks to recover back money paid on usury, as well as where he asks to prevent the lender from receiving more than the principal of his loan, and which is yet unpaid 1
It had been held by Treby, C. J. in Tomkins v. Bernet, 1 Salk. 22. that indebitatus assumpsit would not lie to recover back money paid on an usurious contract, on the ground, that the party who pays is a particeps criminis with him who receives, and that volenti non fit injuria. That decision was referred to by counsel as an authority before lord chancellor Talbot, in the case of Bosanquet v. *498 Dashwood, Ca. Temp. Talb. 38. who said, “ that is no rule to this court, which will never see a creditor running away with an exorbitant interest beyond what the law allows (though the money has been paid), without relieving the party injured.” He declared, that the payment of the money would not alter the case in the court of equity, for it ought not to have been paid; and the maxim volenti non fit injuria, would no more hold in case of an usurious contract, than it would in all cases of hard bargains against which the court relieves. He moreover said, that a borrower could not be said to be a particeps criminis, for he is oppressed, and his necessities oblige him to submit to the terms imposed upon him by the corrupt lender; and in this it differed from the case of gaming. He affirmed the decree at the rolls; which was, that the executor of the lender should account, and all that had been paid over and above legal interest should be deducted out* of the principal at the time paid ; and that whatever the lender had received more than was due with legal interest, that was to be refunded by the defendant as executor of the lender. Such is the rule in the english court of chancery. And notwithstanding the decision before referred to from Salkeld, the same rule now prevails in the english courts of common law: the borrower may now recover back the excess of interest paid by him on an usurious contract, in an action of assumpsit for money had and received. Browning v. Morris, 2 Cowp. 792. Smith v. Bromley, 2 Doug. 696. in note.
Is the rule which prevails in England, applicable to us ? There is no doubt that both courts are open here as well as there, to the borrower who seeks to recover back the excess paid by him on an usurious contract. But is the quantum of that excess varied by the operation of the 3rd section of our statute against usury? In Stone v. Smith and Ware, 6 Munf. 541. Ware, the usurer, had received the whole amount of the unlawful gain, and as to him the question was, how much he should refund? The decision of the court was, that he was to receive his principal and interest, and refund the excess. By not compelling him to refund *499 the excess over and above the principal alone, the court shewed, that, in its opinion, the case did not come within the operation of the 3rd section of the statute; but the reason why it did not, was not given. It is true, that judge Roane, W’ho was one of the three judges who decided that case, in the subsequent case of M'Rherrin v. King, 1 Rand. 190. expressed much dissatisfaction with it, and wished it to be reconsidered; but it has never been shaken by any judicial decision.
The only other case in which this question has been brought up to this court, and decided by it, is Clarkson's adm’r v. Garland, 1 Leigh 147. The point was fully discussed by Mr. Johnson for the appellant, and Mr. Stanard for the appellee: and the court consisting of judges Cabell, Green and Carr, unanimously decided, that where a borrower seeks in equity an account of, and a decree for, money already paid on an usurious contract, the measure of relief is the excess paid above principal and lawful interest, and if his payments exceed principal and lawful interest, the surplus with interest shall be decreed to him; in other words, that the 3rd section of our statute does not apply to such a demand, although it expressly applies to the case of a claim for relief against an usurious debt yet unpaid.
But it has been supposed, that the case of Young v. Scott, 4 Rand. 415. is an authority to which the case of Clarkson v. Garland is in opposition. It seems to have been so looked upon both by judge Carr, in Martin v. Lindsay, 1 Leigh 502. and by judge Tucker in his commentaries, vol. 1. p. 371. At least, both of those judges adopt the statement of the reporter in the caption of the case, as giving the result of that decision. It is a mistake; such was not the decision, atid the reporter was inaccurate. I have examined the record of the case, and the decree as entered in the order book, and I hopo I may be excused for stating it. Young, the plaintiff’, alleged, that he had become the indorser for Dabney the maker of a negotiable note to Scott, in March 1818, for 750 dollars, payable in fifty days; that the real sum lent to Dabney was only 712 dollars 50 cents; that *500 the note was renewed from time to time, and finally was protested some time in May 1819 : that during that period he had paid to Scott 168 dollars 75 cents usurious interest, which being deducted from the sum really lent, left the principal sum of 543 dollars 75 cents due; and that Scott had obtained his judgment at law against him for the nominal amount of the note with interest: he prayed an injunction as to all of the judgment except the sum above mentioned, which he acknowledged to be justly due, and which he expressed his readiness and willingness to pay, and called on Scott for a full discovery of the usury. Scott by his answer, admitted the loan, but said the sum was 725 dollars: he admitted the usury to be ttvo per cent, per month; he admitted that he had received 45 dollars in cash by way of interest, and three notes from the plaintiff for the residue of the usurious interest amounting to 140 dollars, which he filed with his answer. There was no evidence taken in the cause: the decree of this court was founded on the admissions of the answer. The court deducted the 45 dollars paid by Ybung, and the 543 dollars 75 cents'admitted to be due, and which he did not injoin, from 725 dollars the amount of the loan, dissolved the injunction as to 136 dollars 25 cents, the balance of the principal, and perpetuated it as to the residue ; directed the three small notes to be cancelled ; and gave Young his costs in the courts of appeals and of chancery. It is true, that two of the judges, in giving their opinions, did go beyond the case, as it appeared in the record. Judge Carr said, he considered every bill in equity for relief against usury, a bill under the 3rd section; that no man could come into that forum for relief from the principal sum borrowed, as that would be calling on equity to enforce a penalty; nor is he obliged to state that’ he has no evidence, and depends on the answer; and if the answer deny the usury, he may prove it aliunde, if in his power. And, however he may succeed, whether by the confession of the answer, or other proof, the lender must “ accept his principal money without any interest, and pay costs, but be discharged from the other penalties of the act.” Although he uses the *501 words “ every bill,” yet, I apprehend, he did not mean to extend it to the case of a plaintiff who seeks to have money refunded to him which had been paid; that kind of claim does not appear to have been in his contemplation. But judge Green, in his opinion, goes further, and contends, very strenuously, that the 3rd section applies to all cases, whether the money has been paid or not. He would, therefore, extend it to the case of a bill claiming to have money refunded which had been paid under an usurious contract. Judge Cabell, in his opinion, adheres to the case made by the record: he shews, that the bill seeks a discovery, and asks the precise measure of relief indicated by the 3rd section of the statute, and says he could not consider it in any other light than a bill exhibited under that section. In that opinion, the other two judges must have concurred, and the decree rendered was exactly in conformity with it.
Reverting now to the decision of Clarkson v. Garland, I must say, that so far from its being weakened, it is strengthened by Young v. Scott. Both decisions were made by the same three judges, and notwithstanding the strong argument, which judge Green advanced to prove, that the 3rd section did apply to the case of a party seeking to recover back money which had been paid on an usurious contract, yet we find him, three years afterwards, concurring in the decree rendered in Clarkson v. Garland. The question had not been discussed in Young v. Scott, and there can be little doubt, that the investigation of the question at the bar, and further reflection on it, induced him to surrender the opinion he had formerly given.
I am of opinion, that, whatever doubt may heretofore have existed as to this question, the rule adopted in Stone v. Ware, and Clarkson v. Garland, should now be considered as established, and ought not again to be called in question.
But have the mortgage debts, in the present case, been paid ? To decide this question, let us consider the situation of the parties. Snapp had parted with his whole legal title by the mortgages: he had nothing remaining in him but an equity of redemption, which he assigned by the *502 deed of trust. By the sale under the deed of trust, Joseph Stover became the purchaser of the equity of redemption., He became the purchaser, without any notice of Snapp’s latent equity against the mortgage debts. He' afterwards sold, and conveyed the equity of redemption to Christian Stover, who thus became seized of the whole estate. As purchaser, Joseph Stover had a right to pay off and discharge the incumbrance on the land; especially as Snapp did not inhibit him by any legal process, or by any actual notice or warning, from paying it. He had nothing to do with the dispute between Christian Stover and Snapp, of which he knew nothing, and, as purchaser of the equity of redemption, he could not have pleaded that there was usury practised by the mortgagee against the mortgagor; De Wolf v. Johnson, 10 Wheat. 393. If he had immediately paid off the incumbrance in cash, without any warning or notice, he would have satisfied Christian Stover. I see no difference between such a payment, and a payment in land. By the sale and conveyance to Christian Stover, he,has been in fact satisfied the whole amount of his debt, and has no further claim against Snapp. But it is said, that Snapp never consented to the payment, and that without such consent his debt cannot be considered as paid, as between Christian Stover and himself. I consider his consent to have been given, when he executed the mortgages, and the deed of trust; for by those acts he consented to all the consequences which by law would result from them. When a debtor executes his bond, he knows that he is liable to be sued on it, and to have judgment and execution awarded against him; and if the money is made under execution, although his property is sold against his will, yet the .payment by the sheriff is a payment by himself; the sheriff stands in his place, and the payment made by him has relation to the original consent which the debtor gave when he executed his bond. So, when Joseph Stover became the purchaser, liable to pay the incumbrances, he stood in the place of Snapp, the debtor, and when he discharged the incumbrance, it was a payment by Snapp.
*503 For these reasons, I am of opinion that the decree agreed upon at die iast term, be now entered as the decree of the court; except that the debt should be considered as having been paid at the time of the sale of the land from Joseph to Christian Stover, instead of the time of the purchase by Joseph Stover. The deed from Joseph Stover to Christian Stover is the best evidence we have of that time, and as that deed appears to have been executed and recorded on the 7th June 1807,1 consider that as the day on which the debt was paid.
Care., J.
Upon the hearing of this cause at the Iast term, the court was unanimously of opinion, that neither the sale to Joseph Stover, nor that to Christian, could be distmbed; we all agreed also, that Christian’s debts, amounting to £ 1500. were usurious, and that the usury exacted was 20 per cent, on the amount; we were all further of opinion, that equity ought to redress Snapp: the point of difference was as to the measure of redress. Three of us thought, that Christian Stover should be allowed to retain his principal money (the real sum lent) with interest up to the date, when he was considered to have received payment, and that the excess with interest from the same date till paid, should be decreed to Snapp. The fourth judge thought, that the whole amount of interest should be deducted from Christianas debt, and added to the usurious excess, and that these sums should compose the aggregate, for which, with interest, a decree should be rendered in Snapp’s favor. The counsel for Snapp asked a reargument of this point, which was granted. We have heard it, and are now to decide.
That he who asks equity must do it to the same person, is a maxim of universal operation in courts of equity. Under the influence of this principle, no matter how gross the fraud, by which one man has obtained from another, a deed, judgment, or any other legal security for money, if he who is defrauded comes into equity for relief, it will only be granted to him, on condition of his paying to the other, the *504 sum which he really owes him; and to the amount of this sum, the fraudulent deed or judgment, will be ordered to stand as a security. Thus in Rich v. Sydenham, 1 Ch. Ca. 202. A. lent B. £ 90. and got B.’s bond when he was drunk for £ 800. for which sum he obtained a judgment. A. by bill, sought to subject B.’s trust estate to this judgment. Equity would not relieve him even to the amount of the £ 90.—“ Sed secus, if B. had gone into equity to be relieved against the judgment, for then he must have paid the money borrowed.” To the same effect are the cases of Proof v. Hines, Ca. Temp. Talb. 111. Crowe v. Ballard, 3 Bro. C. C. 117. 1 Ves. jr. 220. and Purcell v. M'Namara, 14 Ves. 91. In Saunderson v. Glass, 2 Atk. 296. a solicitor made an absolute deed of conveyance to himself for £ 1000. from the plaintiff’s wife, who had full power to dispose of this sum, and was at that time separated from her husband. The £ 1000. was intended by the wife to be held by the grantee, in trust for her daughter; but he made no declaration of trust. Here was a vile fraud; yet in acting upon this deed, lord Hardwiclce decreed, that it should stand as a security for such sum as was justly due the solicitor. In Attorney General v. Baliol College, 9 Mod. (last edi.) 412. the court decided, that if a conveyance is good at law, and the grantor is obliged to come into equity to set it aside for fraud, he must do equity, or he shall not be relieved.”
In England, there is a statute against usury quite as strong as ours; indeed ours is taken substantially from theirs, except that we have added the provision forming the third section of our law. That the english statute against usury has not prevented the courts either of law or equity, from applying to such cases, the maxim that “ he who asks equity shall do it,” there are numerous cases to prove. In Smith v. Bromley, 2 Doug. 697. in note, lord Mansfield said, “ so far as principal and legal interest went, the debtor was obliged in natural justice, to pay; therefore, he could not recover it back. But for all above legal interest, equity will assist the debtor to retain, if not paid, or an action will lie to *505 recover back the surplus, if the whole has been paid.” In Fitzroy v. Gwillim, 1 T. R. 153. goods were pawned as a security upon an usurious contract; the borrower brought trover for the goods; lord Mansfield said,—“ This is an equitable action brought by the plaintiff, in order to be relieved from an usurious contract. She must come therefore with clean hands, according to the principle laid down in Bosanquet v. Dashwood, that those who seek equity, must do equity. It was there determined, that a court of equity would afford relief in such cases upon payment of principal and interest. Á lender upon an usurious contract, is precluded from recovering any thing upon such contract: but if a borrower seek relief, he must first do what is right, as between the parties. Here the plaintiff did not tender what had been actually advanced, and cannot therefore have the benefit of this equitable action.” If the courts of law act thus upon this maxim, in cases of usury, it may well be supposed, that courts of equity are not behind hand. Accordingly there are more cases than I shall pretend to cite. In Henkle v. Royal Exchange Ass. Co. 1 Ves. sen. 319. lord Hardwicke lays down the rule with great clearness and force: so, in Brownsword v. Edwards, 2 Ves. sen. 246. and Pitt v. Cholmondeley, Id. 567. In Scott v. Nesbitt, 2 Bro. C. C. 649. S. C. 2 Cox 183, there was a judgment at law, and application to set it aside for usury : and lord Thurloio said, “ l take it to be an universal rule, that if it be necessary for you to come into this court, to displace a judgment, you must do it upon the equitable terms of paying the principal money really due with lawful interestafter some further remarks, he repeats—“ But, at any rate, I consider it as a universal rule, that you shall not in this court, set aside a judgment at law, without offering complete equitable terms; that is, to pay principal with legal interest.” In Srivener ex parte, 3 Ves. & Beam. 14. lord Eldon holds the same language: “ At law (he says) you must make out the charge of usury ; and in equity you cannot come for relief, without offering to pay what is really due; and must either prove the usury by legal evidence, or have the confession of the *506 party.” These authorities shew, that in England cases of usury are not excepted from the rule, “ that he who asks equity shall do it;” and also, that in the application of the rule, the legal interest is considered as justly due as the principal.
What change in these points has the third section of our statute made with us ? The answer is easy, when we have once decided that the particular case comes within the provision: the lender shall have his principal money, without interest and pay costs. But what cases do come within it ? those only where a borrower exhibits his bill for discovery and protection against a usurious loan outstanding? or those also, where, having paid up principal, interest and usury, the borrower comes into equity to recover back the excess? The first section of the statute settles the rate of interest, and declares all bonds &c. by which a higher interest is reserved or taken, utterly void. The second section enacts, that if any person shall by corrupt bargain &c. take, accept or receive, for the loan of money &c. above the rate of six per cent, per annum, he shall forfeit double the value &c. one moiety to the commonwealth, the other to the informer &c. The third section enacts, that “ any borrower of money or goods, may exhibit a bill against the lender, and compel him to discover upon oath, the money, or other thing really lent, and all bargains, contracts or shifts, which shall have passed between them, relative to such loan, or the repayment thereof, and the interest or consideration for the same; and if thereupon it shall appear, that more than lawful interest was reserved, the lender shall be obliged to accept his principal money without any interest or other consideration, and pay costs, but shall be discharged from all other penalties of this act.” After the most careful examination I am capable of giving to this section, I am of opinion, that it is applicable to those cases only, where a borrower invokes the aid of equity against an unpaid debt. Observe the marked distinction in the law, between the words reserved, and taken. Thus, in the first section, all bonds &c. are declared void on which more than legal interest is reserved or taken, that is, *507 where it has actually been taken, or is reserved by the instrumént to be taken hereafter. In the second section, if any person shall take, accept or receive more than legal interest, he shall forfeit double the value &c. Nov, would this forfeiture be incurred, by reserving more than legal interest? We know from many cases, that it would not; that to constitute the offence here spoken of, an actual taking or receiving is necessary. In the third section compelling a discovery of the contract, it is added, “ and if thereupon it shall appear, that more than lawful interest was reserved, the lender shall be obliged” &c. why is the word reserved used here? and why used alone? Why not reserved or taken, as in the first section,'—taken or received, as in the second ? why, but because the law meant to include, cases of unpaid debts only, where the usury was reserved to be taken in future, not actually taken or received before the bill filed. Again, the law says, if it shall appear, that more than lawful interest was reserved, the lender shall be obliged to accept his principal money See. Why to accept, if the principal, interest, and usury had been already paid, and the bill was to recover back the excess ? The lender would have to disgorge not to accept: he would have to pay back, and the law would have said “ the lender shall be suffered to retain his principal money, not shall be obliged to accept his principal. Further, the loss of interest imposed by this section on the lender, is a penalty, not only in the nature of the thing, and by the authority of many cases, but is so considered by this very section; for it says, the lender shall accept his principal money, without any interest or other consideration, and pay costs, but shall be discharged from all oilier penalties of the act. Why, all other penalties, if this loss of interest, was not considered a penalty ? If it had not been so considered, the proper and natural language would have been, shall be discharged from “ all the penalties,” not “ all other penalties” of the act. The section being penal, then, it ought to receive a strict, rather than a liberal construction; especially, as the instrument for enforcing this penalty is a court of equity, whose general function is to relieve against forfeitures and penalties.
*508 ' - The construction here contended for, is- strengthened, I think, by looking to the statute of 1734, ch. 5. § 4. 4 Hen. stat. at large, pp. 395, 6. where the provision in question was first made law. There is a preamble to it, shewing that it was to prevent the payment of exorbitant interest, not to enable the party to recover it back, that this provision was enacted.
It has been supposed, that Young v. Scott, 4 Rand. 415. had settled the construction of this provision, as extending to cases of usury paid as well as outstanding. The answer is, that that case could not settle the point: 1st, because it was not before the court, that being the case of an unpaid debt, and directly within the third section, as a bill of discovery; 2ndly, because though two of the judges did, extrajudicially, go into the subject, the third forbore to touch it, with the declared purpose of leaving the point open, the opinion of two judges never being taken as authority. With respect to that part of my opinion in Young v. Scott, which treats of applications under the third section, it- is largely, loosely and incautiously expressed: I spoke with reference to the'ease before us, which was that of an outstanding debt, and had not in my mind at all the case of an application to equity to recover back what had been paid. The generality of my remark, that “ every bill for relief against usury was a bill under this section,” was meant to meet the position, (< that no bill but a bill of discovery was a bill under this section.” I thought, that whether a borrower had proof in hand, or must rely on a discovery from the lender, still, if his bill sought relief against a usurious outstanding debt, it was a bill under this section ; an opinion of which I am by no means so confident now as I was then. The same remark applies to my general expressions on this point in Martin v. Lindsay, 1 Leigh 499. My brother Green did certainly in Young v. Scott express the opinion that the statute applied to all cases, whether the money had been paid or not; but it did not so strike me, till I read it in the printed report, and then I noted in the margin my dissent. His reasoning is ingenious and strong, as it always was; but the view I have already given of this section, satisfies me, *509 that it was never meant to embrace cases where the money has been paid. I consider too, that my opinion has the clear authority of Stone v. Ware, 6 Munf. 541. and Clarkson’s adm’r v. Garland, 1 Leigh 147. to support it.
I come now to the last point in the case : have the debts contracted to Christian Stover been paid ? It is very clear to me, that they have. Joseph Stover bought the land under his deed of trust, with proclamation that it was sold subject to Christian's mortgages, and Snapp who was present, and lived on the land, expressly assented to this. These mortgages, then, became a part of the purchase money which Joseph Stover gave for the land. They were debts, which he owed Christian, secured on his land. He held the land two years, and then sold it to Christian, having received from Snapp no notice not to pay Christian’s debt. This court has said, that the sale to Christian must stand. What did Christian give for the land 1 His own liens and Joseph’s debt. Is not the debt due Christian paid by this transaction? The whole of the liens amounted,—say to 8000 dollars; Christian’s to 6500, and JosejAi’s to 1500 dollars. Suppose upon the sale to Christian, Joseph had made him lay down on the table the whole 8000 dollars, and then had taken to himself his 1500 dollars, and handed to Christian his 6500 dollars: would not Christian have been paid ? and is he less so, because this idle ceremony was not gone through ? In truth, when the court decided, that the sale must stand, it seems to me, that it decided, as clearly as if it had said it, in so many words, that Christian’s debt was paid. My brethren think that this payment was made on 7th June 1807, when the deed from Joseph to Christian bears date, and I believe they are right.
Cabell, J
When this case was before us at the last term, I differed with my brethren as to the extent of the relief to which Snapp was entitled. They thought him entitled to nothing but the excess of Christian Stover’s claims beyond principal and legal interest; and I thought him entitled to all beyond the principal. This difference of *510 opinion grew out of a difference between us on another point, namely, whether Christian Stover’s debt is to be regarded as having been already paid and discharged, or as a debt still due and subsisting. We all agreed, that if the debt was to be regarded as being still due, Snapp was entitled to be relieved against the whole of it, except the principal sum borrowed; and we all agreed, also, that if the debt was to be regarded as having been paid to Christian Stover, Snapp could recover back no more than the excess beyond the principal and legal interest. I thought that, under the circumstances of the case, the debt was still due; my brethren thought it paid and discharged. This point has been ably argued during the present term; and I am now entirely convinced, that my former opinion was erroneous.
Joseph Stover having purchased the equity of redemption in the land, subject to Christian Stover’s prior mortgages, he became bound to pay the amount of those mortgages. This obligation might have been enforced by Christian Stover, and in a suit brought by him for that purpose, it would not have been competent to Joseph Stover to object, that the debt was usurious; De Wolf v. Johnson, 10 Wheat. 393. Being thus bound to pay the debt, he had a right to pay it, in the absence of all objection to the contrary, on the part of Snapp. It must not be forgotten that, at the time he became a purchase, Snapp was present, and made no objection to Christian Stover’s debt: on the contrary, he said he was willing to pay both debts. Joseph Stover was not obliged to have this debt forever hanging over him, and running on upon interest. He held the land two years, during which he heard nothing from Snapp; and then, wishing to close the transaction, he sold his interest in the land to Christian Stover, for the amount of all the incumbrances. Now, it is perfectly manifest, that after this sale, neither Snapp nor Christian Stover could have been entertained in a court of equity, or elsewhere, to demand from Joseph Stover any part of the debt due to Christian Stover. And this proves, that the transaction amounted to a payment by Joseph Stover. Being a payment by him, to *511 •whom did it enure? To Christian Stover, certainly, whose * • • claims were thus extinguished by it. This payment extinguisbed the claims of Snapp also on Joseph Stover; but it left Snapp free to demand from Christian Stover, the restoration of that which could not be retained in equity and good conscience; namely, the excess beyond principal and legal interest. This, in all cases where a party seeks to recover back money paid on an usurious contract, is established to be the true measure of relief, by the clearest principles of equity, and by the authority of the cases of Stone v. Ware, and Clarkson’s adm’r v. Garland.
Bkooke, J.
I concur in the proposed decree, on the ground that the mortgage debts to Christian Stover, the lender, have been paid by Snapp, the borrower; and, consequently, that the case is not within the third section of the statute against usury. And I should also have concurred in the decree, if the money was unpaid and still due by the borrower, the bill in the case not being a bill of discovery. I think the sound construction of the third section requires, not only that the money should be still due by the borrower, to entitle him to the benefit of that provision, but that his bill ought to be, essentially, a bill of discovery; which I think is plainly declared by the section.
Decree reversed.